### George Battista, Jr. v. The United Illuminating Company
### (4156)

Borden, Spallone and Bieluch, Js.

Argued on February 6—decision released April 14, 1987

*Jackson T. King,* with whom was *Susan King Shaw,* for the appellant (plaintiff).

*Jeremy G. Zimmermann* and *Barry P. Beletsky,* with whom, on the brief, were *Carolyn R. Spencer* and *Richard P. Sperandeo,* for the appellee (defendant).

BORDEN, J. The plaintiff appeals from the judgment rendered following the denial of his motion to set aside the verdict, after a trial to a jury, on three counts of a complaint alleging defamation, wrongful discharge in tort and wrongful discharge in contract. The plaintiff claims that the trial court erred in (1) charging the jury that they could only award nominal damages on the defamation count, and (2) failing to charge in accord with the plaintiff's requests on the wrongful discharge counts. We find error in part.

The jury could reasonably have found the following facts.The plaintiff was employed by the defendant, The

United Illuminating Company (U.I.), for nearly twenty-five years. He began as a meter reader in 1954, and at the time of his termination in 1978 had recently been promoted to customer service representative. He was considered a good employee, having received favorable comments from his supervisors, and he considered his job his "pride and joy."

In 1975 and early 1976, U.I. became concerned about an increase in meter tampering and theft of electricity by its employees. Fred Jacobs, director of security for U.I., implemented an inspection program which consisted of inspection teams which were sent to the homes of U.I. employees for the purpose of inspecting meters for physical evidence of tampering. The plaintiff's meter was inspected on September 27, 1977, and no irregularities were detected. Subsequently, Jacobs discovered that there had been a meter change at the plaintiff's home on September 24, 1976, because of a routine malfunction. Jacobs located the old meter in a U.I. storage facility and retrieved it. The meter had been in the homes of two other customers after having been removed from the plaintiff's home. This meter also failed to reveal evidence of tampering. Jacobs, however, compared the date of manufacture of the meter and the date of final inspection at the factory, as stamped on the back, and discovered a discrepancy which suggested that the plate came from another meter.

A subsequent review of the plaintiff's account history showed a drop in metered electrical use going back to 1971. The defendant presented evidence that the reduction could not have been obtained without meter tampering. The plaintiff testified, however, that during the early to mid 1970's, he had taken numerous steps to conserve electricity in his home, pursuant to U.I.'s policy of promoting conservation, including installation of insulation, turning off electricity in

unused rooms, lowering thermostats, regulation of the hot water heater, line-drying clothes, burning wood and using electric blankets.

An ad hoc committee, set up by U.I. to determine whether to terminate employees suspected of meter tampering, decided to fire the plaintiff on April 27, 1978.

In August, 1978, the plaintiff received an electric bill from U.I. which included a charge for unmetered service. The plaintiff's wife called Russell Young, Jr., a U.I. review officer, to complain about the size of the electric bill. In response, Young sent a letter to the plaintiff which stated, in relevant part, "I have reviewed the circumstances and procedures concerning the rebilling of your account for unmetered service. In March 9, 1978, it was verified that your electric meter was tampered with in the following manner: 1. Meter changed with old meter name plate (and old meter number) being retained on 'new' meter . . . . It is my conclusion that you have been properly and accurately rebilled for unmetered electricity in the amount of $1,216.01."[1] Copies of this letter were circulated to three other U.I. employees in the security and billing departments.

---

[1]The letter set forth in its entirety:

"August 16, 1978

Mr. George Battista, Jr.
27 Roosevelt Street
Hamden, CT 06514

Re: 12125-3425006

Dear Mr. Battista:

I have reviewed the circumstances and procedures concerning the rebilling of your account for unmetered service.

In March, 1978, it was verified that your electric meter was tampered with in the following manner:

1. Meter changed with old meter name plate (and old meter number) being retained on "new" meter.

As a result of the above report, your account was analyzed and a rebilling was indicated for the period December, 1971, through April, 1976. The

The plaintiff brought this action against U.I. in three counts, claiming defamation, wrongful discharge in tort and wrongful discharge in contract, respectively. A verdict was returned, after a jury trial, in the plaintiff's favor on the defamation count and in the defendant's favor on the second and third counts.[2] The jury awarded $2500 in damages on the first count. On the defendant's motion, the court ordered a remittitur of $2499, leaving an award of $1. The plaintiff moved to set aside the verdict on all three counts. He appeals from the judgment rendered after the denial of this motion.

I

The plaintiff first claims that the trial court erred in its instructions to the jury on the damages it could award on the defamation count. The plaintiff requested a charge which would permit the jury to award gen-

---

basis of this rebill was the period December, 1970, through November, 1971.

All applicable rates and fuel cost adjustment factors, which were in effect at the time, were applied to the rebill period. In addition, degree day factors were applied to the heating months encompassed in the rebill period.

After reviewing all of the above factors, it is my conclusion that you have been properly and accurately rebilled for unmetered electricity in the amount of $1,216.01.

If you would like to make reasonable payment arrangements on this amount, please contact our Credit and Collection Supervisor, Ms. Lukas.

If you still consider our bill to be inaccurate in any respect or if you have any other complaint pertaining to this matter, you have the right to request, in writing, a further investigation by the Connecticut Public Utilities Control Authority within four days from your receipt of this decision.

Sincerely,

Russell E. Young, Jr.
New Haven Review
Officer

REY: jhm
cc: F. Jacobs
P. Lukas
E. Vaughn"

[2] The defendant brought a counterclaim for damages asserting that the plaintiff used electric services for which he did not pay. The jury returned a verdict in the plaintiff's favor on the defendant's counterclaim.

eral damages.[3] The trial court rejected the plaintiff's request and charged that the plaintiff could only recover nominal damages since no evidence of actual damages had been presented. The plaintiff excepted to the charge. The jury, despite the instruction, returned a verdict for the plaintiff in the amount of $2500, which the trial court reduced to $1.

The gist of the plaintiff's claim is that the defamatory statement in the letter addressed to him constituted libel per se. Under Connecticut law, when a party is the victim of libel per se, he is presumed to be injured and is entitled to general damages without proof of actual damages. Therefore, the plaintiff claims, the trial court erred in limiting the jury to an award of nominal damages. We agree.

While all libel was once actionable without proof of special damages, a distinction arose between "libel per se" and "libel per quod." R. Sack, Libel, Slander & Related Problems, p. 96–97. A libel per quod is not libelous on the face of the communication, but becomes libelous in light of extrinsic facts known by the recipient of the communication. Id., 97. When a plaintiff brings an action in libel per quod, he must plead and prove actual damages in order to recover. D. Wright & J. Fitzgerald, Connecticut Law of Torts (2d Ed.) § 146.

Libel per se, on the other hand, is a libel the defamatory meaning of which is apparent on the face of the

---

[3] The defendant's request to charge was in part: "If you conclude that the defendant falsely accused Mr. Battista of meter tampering and use of unmetered electricity with malice in fact, as I have explained to you, then Mr. Battista would be entitled to general damages. . . . General damages are 'a sum which, as far as money can do, will compensate the plaintiff for injury which has resulted directly and as a natural consequence from the defamatory statements. In determining the amount of such damages properly due him you should consider the extent to which his reputation has been affected for the worse, and as incidental to his injured feelings, any ridicule or shame which has come to him because of the statements, any insult, humiliation or disgrace which they have caused him.' "

statement and is actionable without proof of actual damages. Id. The distinction between libel per se and libel per quod is important because "[a] plaintiff may recover general damages where the defamation in question constitutes libel per se. *Yavis* v. *Sullivan,* 137 Conn. 253, 76 A.2d 99 (1950). 'When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. He is required neither to plead nor to prove it.' *Urban* v. *Hartford Gas Co.,* 139 Conn. 301, 308, 93 A.2d 292 (1952). The individual plaintiff is 'entitled to recover, as general damages, for the injury to his reputation and for the humiliation and mental suffering which the libel caused him.' *Proto* v. *Bridgeport Herald Corporation,* 136 Conn. 557, 571, 72 A.2d 820 (1950)." *Monroe* v. *Crandall,* 3 Conn. App. 214, 220–21, 486 A.2d 657 (1985). "Whether a publication is libelous per se is a question for the court." *Flanagan* v. *McLane,* 87 Conn. 220, 222 (1913); see also *Charles Parker Co.* v. *Silver City Crystal Co.,* 142 Conn. 605, 612, 116 A.2d 440 (1955); R. Sack, supra, p. 101. If, therefore, the plaintiff is correct in his claim that the defamatory statement constituted libel per se, the trial court erred in limiting the jury to an award of nominal damages.

"Whether a published article is libelous per se must be determined upon the face of the article itself. The statements contained therein, taking them in the sense in which common and reasonable minds would understand them, are determinative, and they may not for this purpose be varied or enlarged by innuendo. . . . Two of the general classes of libel which, it is generally recognized, are actionable per se are (1) libels charging crimes and (2) libels which injure a man in his profession and calling." (Citations omitted.) *Proto* v. *Bridgeport Herald Corporation,* supra, 565–66. The plaintiff claims that the communication in the present case was actionable per se because it charged a crime.

To fall within this category of libel per se, the defamatory statement must charge a crime which involves moral turpitude or to which an infamous penalty is attached. Id., 566. The modern view of this requirement is that the crime be a chargeable offense which is punishable by imprisonment. See *Corbett* v. *Register Publishing Co.,* 33 Conn. Sup. 4, 13, 356 A.2d 472 (1975); 2 Restatement (Second), Torts § 571. The allegation that a person committed a crime need not be as specific as in an indictment, but it must bear some reasonable relation to the legislative definition of a crime. R. Sack, supra, pp. 76–77.

Applying the law to the facts of this case, we hold that the defendant's letter to the plaintiff constituted libel per se because, taking its language in the sense in which common and reasonable men would understand it, and without enlarging it by innuendo, it charged the plaintiff with a crime punishable by imprisonment. *Corbett* v. *Register Publishing Co.,* supra. The letter; see note 1, supra; which was addressed to the plaintiff, at a single family dwelling, stated that his bill was for unmetered service, service which by the express language of the letter was unmetered because the plaintiff's meter had been tampered with. The letter details the method by which the meter was tampered with, and concludes with a demand for $1216.01 for the unmetered electricity. Viewing the letter in its entirety, it can reasonably be read to charge the plaintiff with a crime, namely, taking electricity without paying for it, or more colloquially, with theft. The charge falls within the legislative definition of larceny by theft of services in the third degree, in violation of General Statutes §§ 53a-124 (a) (1) and 53a-119 (7) (4),[4] a class D felony punishable by one to five years imprisonment. General Statutes § 53a-35a (6).

---

[4] General Statutes § 53a-124 (a) (1) provides: "(a) A person is guilty of larceny in the third degree when he commits larceny as defined in section

We reject the defendant's claim that for a statement to be libelous per se it must specifically charge a crime, presumably by its statutory label. The letter in this case did not have to charge the plaintiff with "larceny" as long as the words could be reasonably interpreted to charge such a crime. See *Corbett* v. *Register Publishing Co.*, supra, 13 (newspaper article accusing the plaintiff of using foul language and kicking a police officer during the course of a police investigation reasonably susceptible of supporting a charge of assault on a police officer in violation of General Statutes § 53a-167c, and resisting a police officer in violation of General Statutes § 53a-167a).[5]

## II

The plaintiff also claims that the trial court erred when it refused to adopt the plaintiff's requests to

53a-119 and: (1) The value of the property or service exceeds one thousand dollars . . . ."

General Statutes § 53a-119 (7) (4) provides in relevant part that larceny includes: "Theft of services. A person is guilty of theft of services when . . . (4) with intent to avoid payment by himself or another person for a prospective or already rendered service the charge or compensation for which is measured by a meter or other mechanical device provided by the supplier of the service, he tampers with such device or with other equipment related thereto, or in any manner attempts to prevent the meter or device from performing its measuring function, without the consent of the supplier of the service. A person who tampers with such a device or equipment without the consent of the supplier of the service is presumed to do so with intent to avoid, or to enable another to avoid, payment for the service involved . . . ."

[5] The defendant presents two further claims in support of the trial court's refusal to instruct on general damages. It first claims that the concept of presumed damages has come under sharp attack; see *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974); thus casting doubt on its continued application. *Gertz*, however, involved first amendment rights which are not at issue in this case, because there is neither a public official or public figure plaintiff, nor a media defendant. Additionally, our recent case of *Monroe* v. *Crandall*, 3 Conn. App. 214, 220–21, 486 A.2d 657 (1985), reiterated that in libel per se actions involving private parties, damages may be presumed. The defendant's second claim is that the jury had the discretion to award only nominal damages. While this is certainly true, it is irrelevant in this case because the jury was never given the opportunity to consider and reject an award of general damages.

charge on the second and third counts of the complaint charging wrongful discharge in tort and contract, respectively. We disagree. Because a claim of wrongful discharge is a single theory of liability, whether framed in tort or contract; *Magnan* v. *Anaconda Industries, Inc.,* 193 Conn. 558, 572, 479 A.2d 781 (1984); *Schmidt* v. *Yardney Electric Corporation,* 4 Conn. App. 69, 71, 492 A.2d 512 (1985); we will treat the plaintiff's requests to charge on both counts together.

Traditionally, an employment contract of indefinite duration is terminable at the will of either party. *Magnan* v. *Anaconda Industries, Inc.,* supra, 562–63. In *Sheets* v. *Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 475, 427 A.2d 385 (1980), our Supreme Court articulated a narrow exception to this rule when it recognized a common law cause of action in tort for a discharge "if the former employee can prove a demonstrably *improper* reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." (Emphasis in original.) In *Magnan* v. *Anaconda, Industries, Inc.,* supra, 572, our Supreme Court held that a plaintiff also has a cause of action for wrongful discharge in contract for violation of the implied covenant of good faith and fair dealing. That cause of action, however, is coterminous with, and extends no further than, a cause of action for wrongful discharge in tort. Id. In *Sheets* v. *Teddy's Frosted Foods, Inc.,* supra, the plaintiff had alleged that his employer had dismissed him in retaliation for his insistence that its products comply with the requirement of a state labeling statute. Id., 480. In *Magnan* v. *Anaconda Industries, Inc.,* supra, the plaintiff alleged that his employer had dismissed him in punishment for refusing to sign a statement which he claimed was false. Id., 560–61.

Both the second and third counts of the complaint alleged that the plaintiff's discharge contravened the

important public policy of promoting energy conservation. The plaintiff claims that the trial court erred in its instructions on those counts.[6] The trial court instructed the jury that, for the plaintiff to prevail, it must find he was discharged for an improper reason, the impropriety of which is derived from a violation of public policy, and that this would be satisfied if they found that the defendant discharged the plaintiff to punish him for his conservation efforts or because the defendant wanted to frustrate the practice of conservation.[7] The plaintiff claims that this request to charge is erroneous because it requires the jury to find that the defendant, when it discharged the plaintiff, *intended* to frustrate the public policy of energy conservation. The plaintiff argues that the jury should have been instructed to return a verdict in his favor if it found that his discharge had *the effect* of undermining public policy.[8]

---

[6] The plaintiff raised this claim of error only with respect to the second count, alleging wrongful discharge in tort. In light of *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 572, 479 A.2d 781 (1984), supra, which recognizes a parallel claim in contract, we consider the plaintiff's claim with respect to both counts.

[7] The trial court charged the jury as follows:

"In order for the defendant to be liable to the plaintiff, you must first decide whether the plaintiff has proven an improper reason for his dismissal. This improper reason must be a reason whose impropriety is derived from a violation of public policy; in this case, energy conservation. . . .

"If you find that the defendant discharged the plaintiff to punish him for his conservation efforts or because it wanted to frustrate the practice of energy conservation, then you can properly conclude that this discharge violated public policy.

"On the other hand, if you find that the defendant's agents and employees discharged the plaintiff because they actually believed he was using unmetered energy, even if they were mistaken, then you cannot find the discharge violated public policy and you would be required to return a verdict for the defendant."

[8] The plaintiff requested the following charge:

"You should determine whether such actions by the defendant U.I. would have *the effect* of discouraging citizens from implementing substantial energy conservation measures. If the defendant U.I.'s actions would discourage citizens from substantially reducing their use of electricity, then you would necessarily find that the *important public policy of energy conservation* would be undermined." (Emphasis added.)

We note first, and find very persuasive, the fact that in *Magnan* v. *Anaconda Industries, Inc.,* supra, 575, an instruction almost identical to the one in this case was given to the jury.[9] We also note that the public policy exception to the general rule of the employment at will doctrine is narrowly constructed to serve a limited purpose, namely, to "draw the line between claims that genuinely involve the mandates of public policy and are actionable, and ordinary disputes between employee and employer that are not. We are mindful that the court should not lightly intervene to impart the exercise of managerial discretion or to foment unwarranted litigation." *Sheets* v. *Teddy's Frosted Foods, Inc.,* supra, 477. To prevail under this narrow exception, the plaintiff must prove an *"improper* reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." (Emphasis in original.) Id., 475. In a recent case, our Supreme Court has stated that "[u]nder the exception, the employee has the burden of pleading and proving that his dismissal occurred *for a reason violating public policy."* (Emphasis added.) *Morris* v. *Hartford Courant, Co.,* 200 Conn. 676, 679, 513 A.2d 66 (1986).

The language in *Magnan* and *Morris* suggests that for a discharge to be actionable, there must be more than an incidental effect on public policy. The defend-

---

[9] The charge in *Magnan* v. *Anaconda Industries, Inc.,* 193 Conn. 558, 575, 479 A.2d 781 (1984), provided in relevant part: " '[T]he plaintiff must prove a demonstrably improper reason for his dismissal, a reason whose impropriety derives from some important violation of public policy. . . . If you find that the defendant's motive in terminating Mr. Magnan was to punish him for refusing to sign a statement which the defendant's responsible employees know to be false, then you would be justified in finding his discharge violated public policy. On the other hand if you find that the defendant discharged the plaintiff because it believed the plaintiff had been involved in thefts of company property or had knowledge about them or took part in a cover-up and refused to cooperate in a theft investigation, then you could not properly find that the plaintiff's discharge violated public policy and you would be required to return a verdict for the defendant.' "

ant's *reason* for discharging the plaintiff must contravene public policy. This view is also consistent with the holding in *Morris*. In that case, our Supreme Court held that "[a] false but *negligently* made accusation of criminal conduct as a basis for dismissal is not a 'demonstrably *improper* reason for dismissal.' " (Emphasis in original.) Id., 680.

The plaintiff's request to charge would have had the jury focus, not on the defendant's reason for discharging him and the nexus between that reason and public policy, but on the incidental and unintended effect of the discharge on that policy. None of our cases has gone that far, nor are we persuaded that they lead in that direction. The plaintiff's position would expand the narrow exception to the at will employment rule and thus upset the delicate balance, struck by that exception, between the legitimate interests of employer and employee.

The plaintiff also claims error in the court's refusal to charge as requested on the third count. The plaintiff asked the court, in a single request, to charge the jury that the plaintiff could prevail under the third count, wrongful discharge in contract, if it found any one of the following: (1) that the discharge violated public policy; (2) that the defendant violated the covenant of good faith and fair dealing by violating the reasonable expectations of the parties; or (3) that the defendant violated an implied promise not to act arbitrarily and unreasonably in terminating the plaintiff's employment. The court was entitled, however, to reject this request to charge since it failed to conform to Practice Book § 318. That rule requires that a request to charge contain a single proposition of law which is clearly and concisely stated with citation of authority upon which it is based. The plaintiff, rather than setting forth a single proposition of law, included at least three separate legal theories in a single request to

charge. See *Giglio* v. *Hamilton Heights, Inc.,* 1 Conn. App. 165, 168 n.2, 469 A.2d 416 (1984). The purpose of a request to charge is to inform the court of a party's claim of the applicable principle of law to his case. *Shelnitz* v. *Greenberg,* 200 Conn. 58, 72, 509 A.2d 1023 (1986). Where the request contains more than one principle of law, the court far from being informed, may be misled and is entitled to refuse the request on the ground that it was not properly presented. *Terminal Taxi Co.* v. *Flynn,* 156 Conn. 313, 320, 240 A.2d 881 (1968).

There is error in part; the judgment is set aside as to the first count and the case is remanded for a hearing in damages on that count in accordance with this opinion.

In this opinion the other judges concurred.