[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON MOTIONS TO STRIKE
The defendants Combustion Engineering, Inc. ("Combustion"), Asea Brown Boveri, Inc. ("Asea"), Richard Cronin and Thomas Sacco have moved to strike the First through Third and the Fifth through Seventh Counts of Plaintiff's Complaint. The defendant Kevin Downs has moved to strike the Fifth through Seventh Counts of that Complaint.
Allegations of the Complaint
The Complaint alleges that from September 21, 1982 to May 23, 1995, plaintiff was employed by defendants Combustion Engineering and Asea (collectively the "Corporate Defendants) "in various positions, including most recently Supply Manager." (Complaint, ¶ 7). The plaintiff received favorable reviews, including promotions and pay raises, throughout his tenure. (Complaint, ¶ 8). In January 1995, the president of Combustion and Asea, Richard F. Cronin ("Cronin") announced that the corporation would begin an internal investigation, with employee interviews, into "inappropriate business practices." (Complaint, ¶ 9). On May 19, 1995, the plaintiff was interrogated in a locked conference CT Page 7450 room by Kevin Downs ("Downs") (acting under the authority of the corporate legal counsel). (Complaint, ¶ 12 and 13). The plaintiff was required to sign a confidentiality agreement, which prohibited the plaintiff from discussing the interview with anyone except for his wife. (Complaint, ¶ 14). Downs showed the plaintiff a 3 inch binder with the plaintiff's name displayed on the cover and suggested to the plaintiff that he had detailed information about the plaintiff, his family and his work habits. Downs also informed the plaintiff that information was gathered during the business practices audit and investigation about employees through "clandestime surveillance, wire-tapping, eavesdropping and anonymous informants"; (Complaint, ¶ 15); After the interrogation had continued for several hours Downs accused the plaintiff of having a secret relationship with, and accepting "bribes, lunches, gifts and vacations" from John Nicolace ("Nicolace"), a sales representative. (Complaint, ¶ 15). The plaintiff vigorously denied the accusations about this improper relationship with Nicolace. (Complaint, ¶ 16).
Downs represented to the plaintiff that the investigation had revealed that the plaintiff had placed at least thee [three] purchase orders on behalf of the Corporate Defendants through Nicolace, including one order in excess of $2 million. Plaintiff advised Downs that he had no recollection of any such order. (Complaint, ¶ 18). Downs further represented that if the plaintiff admitted exercising "poor judgment" regarding his relationship with Nicolace, the Corporate Defendants' president, Cronin, would exercise his discretion and plaintiff would not be terminated. Otherwise, if plaintiff failed to acknowledge any wrongdoing, the plaintiff would be terminated immediately for fraud and a lack of integrity. (Complaint, ¶ 20).
Downs handed the plaintiff an eight-page typed document entitled "Original Statement" one page at a time without giving the plaintiff the ability to read the document as a whole. Downs then ordered the plaintiff to sign the top and bottom of each page and execute the statement on the final page acknowledging that all of the statements there were "true and correct." (Complaint, ¶ 22). Downs represented that if the plaintiff signed the statement as written it would be viewed as the exercise of poor judgment and the plaintiff would not be terminated, but if he failed to sign the statement it would be viewed as insubordination. (Complaint, ¶ 24). The plaintiff signed the false statement because he believed that it would be insubordination not to sign it and he was late for an CT Page 7451 appointment. (Complaint, ¶ 25).
Downs then ordered the plaintiff to produce to him on the following Monday morning plaintiff's tax records for the previous five years. (Complaint, ¶ 26). At 3:00 p. m. on the following Monday the plaintiff met with Downs and informed him that the tax information would not be available until the following day. On the following day [the Complaint does not say whether the plaintiff produced his tax records] the plaintiff was terminated for "repeated willful misconduct" based solely on the Statement he had signed. (Complaint ¶ 30).
The plaintiff and fourteen other employees were terminated for alleged misconduct as a result of the internal investigation on May 23, 1995. (Complaint, ¶ 32). On May 23, the plaintiff was escorted out of the building by security personnel with security vehicles positioned outside in full view of his co-workers. (Complaint, ¶ 33). Combustion and Asea, through Cronin, announced the terminations to all employees and then, on May 24 and May 26, "caused to be published in The JournalInquirer and The Hartford Courant the statement that all employees terminated on May 23, 1995, were terminated for improper business conduct." (Complaint, ¶ 35).
Discussion of Law and Ruling
The function of a motion to strike is to test the legal sufficiency of a pleading. Practice Book 152; Ferryman v. Groton,212 Conn. 138, 142, 561 A.2d 432 (1989); Mingachos v. CBS, Inc.,196 Conn. 91, 108, 491 A.2d 368 (1985). In deciding a motion to strike the trial court must consider as true the factual allegations, but not the legal conclusions set forth in the complaint. Liljedahl Bros., Inc. v. Grigsby, 215 Conn. 345, 348,576 A.2d 149 (1990); Blancato v. Feldspar Corp. , 203 Conn. 34,36, 522 A.2d 1235 (1987).
Implied Contract
In the First Count the plaintiff claims that he had an implied contract of employment under which he could not be terminated without good cause. Under Connecticut law both contracts of permanent employment or for an indefinite term of employment are terminable at will by the employer, Battista v.United Illuminating Co., 10 Conn. App. 486, 495, 523 A.2d 1356
(1987), without any requirement that the employer have good cause CT Page 7452 for such termination. Sheets v. Teddy's Frosted Foods, Inc.,179 Conn. 471, 474, 427 A.2d 385 (1980).
"A contract implied in fact, like an express contract, depends on actual agreement D'Ulisse-Cupo v. Board of Directorsof Notre Dame High School, 202 Conn. 206, 211 n. 2, 520 A.2d 217
(1987); Therrien v. Safeguard Mfg. Co., 180 Conn. 91, 94,429 A.2d 808 (1980); Brighenti v. New Britain Shirt Corporation,167 Conn. 403, 406, 356 A.2d 181 (1974); Corriveau v. Jenkins Bros.,144 Conn. 383, 387, 132 A.2d 67 (1957)." Coelho v. Posi-SealInternational Inc., 208 Conn. 106, 111-12, 544 A.2d 170 (1988). Accordingly, to prevail on his wrongful termination claim, "which alleged the existence of an implied agreement between the parties, the plaintiff had the burden of proving by a fair preponderance of the evidence that [the defendant] had agreed, either by words or action or conduct, to undertake [some] form of actual contract commitment to him under which he could not be terminated without just cause [following progressive disciplinary measures]. D'Ulisse-Cupo v. Board of Directors of Notre Dame HighSchool, supra, 212 n. 2; Therrien v. Safeguard Mfg. Co., supra, 94-95." Id, 112.
The plaintiff alleges that his employment contract is implied in the following: In January, 1995 when the Corporate Defendants announced that they would undertake an internal investigation relating to improper business practices, they further announced that the investigation would be conducted in a manner "consistent with fairness and thoroughness." (Complaint, ¶ 9). Thereafter in March of 1995 the Corporate Defendants stated in an announcement relating to the investigation, "[o]ur goal is to ensure an environment exists that enables all CES employees to continue to prosper by dealing fairly and honestly with each other. . ." (Complaint, ¶ 10).
The foregoing representations cannot form the basis of an implied contract. Every contract requires consideration. An employee's accepting employment and/or relocating to accept employment has been held to be sufficient consideration to support promises by an employer which are made prior to the commencement of the employment relationship. An employee remaining on the job and declining to seek other employment is sometimes deemed to be consideration to support an employer's promise made after the employment relationship commences. Coelhov. Posi-seal International, Inc., 208 Conn. 106, 118,544 A.2d 170 (1988); Magnan v. Anaconda Industries, Inc., supra, 564-65. CT Page 7453 The foregoing representations on which the plaintiff relies to form the basis of his implied contract were made at the same time as Corporate Defendants commenced their investigation into alleged wrongdoing by the plaintiff and other employees. The plaintiff has not alleged any consideration which he gave to support those alleged promises, or any action he took in detrimental reliance thereon. It is inconceivable that there was any consideration given by the plaintiff to support such alleged promises and, therefore, they cannot form the basis of his implied contract claim.
The plaintiff alleges the following to support his claim of an implied contract that he could only be fired for good cause. The Corporate Defendants disseminated on a regular basis a "Standards of Business Conduct" handbook which stated:
 a. One of the strengths, central to all our businesses, is a commitment to the highest standard of business conduct.
 b. Protecting our reputation requires each one of us — officers and employees make sound, ethical judgments every day — the kind we can sleep with at night.
 c. One of the hallmarks of a Company's reputation for integrity is its respect for, and compliance with, those laws and regulations, both domestic and foreign, that apply to its business.
 d. Many of the [Corporate Defendants'] activities are not the subject of laws and regulations. In those instances, rules off fairness will govern our conduct at all times, and
 e. A work environment in which every employee is treated equitably and with respect benefits everyone. All employees are expected to comply with relevant laws, obligations and company policies applicable to decision and conduct in the workplace. Compliance includes, but is not limited to: avoiding all forms of verbal or non-verbal harassment (sexual, racial, ethnic, religious, etc); [and] treating each other with respect. (Complaint, ¶ 37)
The "Standards of Business Conduct" handbook also included that: "All information transmitted within the Company must be CT Page 7454 honest and well founded; misrepresentations and shading of information that creates a misleading business picture will not be tolerated;" "Information concerning employees must be treated in confidence, in accordance with policies and procedures established by the Senior Vice President Human Resources;" and "Compliance [with the Standards of Business Conduct] will be a factor in periodic performance appraisals, Violations of [the Corporate Defendants'] policies will result in the taking of appropriate action up to and including discharge from employment. (Complaint, ¶ 38).
Finally the plaintiff alleges that the Corporate Defendants' policies and procedures which included the giving of written warnings, the opportunity to rebut any claim of wrongdoing, and placing employees on probation prior to terminating them created an implied contract that the plaintiff could only be terminated for cause. (Complaint, ¶ 38).
In Reynolds v. Chrysler First Comm. Corp. , 40 Conn. App. 725,673 A.2d 573 (1996), the Appellate Court upheld a summary judgment granted in favor of the employer where the employee alleged that the employer's regular use of progressive discipline policies gave rise to an implied contract. The Court held that the employee's understanding alone was insufficient evidence of the formation of a contract:
 "A contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties." Christensen v. Bic Corp. , 18 Conn. App. 451, 458, 558 A.2d 273 (1989). "The mere fact that the plaintiff believed the guidelines to constitute a contract does not bind [the defendant] without some evidence that it intended to be bound to such a contract. See Brighenti v. New Britain Shirt Corporation, [supra, 167 Conn. 407]." Id., 458.
40 Conn. App. at 730.
The plaintiff may well have "plucked phrases out of context" in alleging his implied contract claim. Even when taken in a manner most favorable to the plaintiff it is difficult to see how the various statements, policies and practices amount to the defendants' "undertak[ing] of [some] form of actual contract commitment to him under which he could not be terminated without just cause. See D'ulisse-Cupo v. Board of Directors of Notre DameHigh School, supra, 212. All statements, except one (Complaint CT Page 7455 ¶ 38), alleged make no mention of the subject of job duration or termination, unlike the statements in Torosyan v. BoehringerIngelheim Pharmaceuticals, Inc., 234 Conn. 1, 662 A.2d 89 (1995) (In response to the plaintiff's preemployment questions about the long term nature of his job with the defendant one of the defendant's managers told the plaintiff that if he did a good job, the defendant would "take care" of him and another interviewer told the plaintiff that he hoped that the plaintiff would stay forever); Finley v. Aetna Life Casualty co.,202 Conn. 190, 520 A.2d 208 (1987) (The defendant's employee manual provided, in a section subtitled "Involuntary Terminations (Dismissals)," that "[i]t is Company policy to terminate any employee who cannot perform satisfactorily, whose attendance is poor or who is otherwise unsuited to his job."); or D'Ulisse-Cupov. Board of Directors of N. D. H. S., 202 Conn. 206, 520 A.2d 217
(1987) (Defendant employer told the plaintiff "that there would be no problem with her teaching certain courses and levels the following year, that everything looked fine for her rehire for the next year, and that she should continue her planning for the exchange program." A notice posted on the school bulletin board stated: "All present faculty members will be offered contracts for next year.").
While the First Count comes perilously close to a failure to state a cause of action for breach of implied contract, "[i]n the absence of `definitive contract language,' however, `the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact.' Bead Chain Mfg. Co. v. SaxtonProducts, Inc., 183 Conn. 266, 274-75, 439 A.2d 314 (1981)."Finley v. Aetna Life Casualty Co., 202 Conn. 190, 520 A.2d 208
(1987). Therefore, the Motion to Strike the First Count is denied.
Wrongful Termination
In the Third Count the plaintiff claims that the Corporate Defendants wrongfully terminated him in violation of the "public policy" embodied in four sections on the Penal Code, Connecticut General Statutes §§ 53a-96 (unlawful restraint), 53a-188
(tampering with private communications), 53a-189 (eavesdropping), and 53a-192 (unlawful coercion).
The Connecticut Supreme Court articulated a narrow exception to the employment at will rule when it recognized a common law CT Page 7456 cause of action in tort for dismissal from employment "if the former employee can prove a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." Sheets v. Teddy's FrostedFoods, Inc., 179 Conn. 471, 475, 427 A.2d 385 (1980)
In Sheets the plaintiff was employed by the defendant, a producer of frozen food products, as its quality control director and operations manager. In his capacity as quality control director and operations manager, the plaintiff noticed deviations from the specifications contained in the defendant's standards and labels, in that some vegetables were substandard and some meat components underweight. These deviations violated statutes regulating the labeling of food. In May of 1977, the plaintiff communicated in writing to his employer concerning the violations. His employment was terminated some five months later.
In formulating the so-called "public policy" exception to the employment at will doctrine, the Court in Sheets stated:
 The issue then becomes the familiar common-law problem of deciding where and how to draw the line between claims that genuinely involve the mandates of public policy and are actionable, and ordinary disputes between employee and employer that are not. We are mindful that courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation. We are, however, equally mindful that the myriad of employees without the bargaining power to command employment contracts for a definite term are entitled to a modicum of judicial protection when their conduct as good citizens is punished by their employers.
179 Conn. at 477 (Emphasis added.)
Under the public policy exception the "defendant's reason fordischarging the plaintiff must contravene public policy."Battista v. United Illuminating Co., 10 Conn. App. 486, 498,523 A.2d 1356 (1987) (Emphasis added). A discharge is not actionable without "more than an incidental effect on public policy."Battista, 10 Conn. App. 497. Where a public policy violation is merely incidental to termination of employment., the public policy exception does not apply. Thus, in Morris v. HartfordCourant, Co., 200 Conn. 676, 680, 513 A.2d 66 (1986) the Court held that a false but negligently made accusation of criminal CT Page 7457 conduct did not constitute a public policy violation sufficient to permit the plaintiff to claim wrongful termination underSheets.
As the language of the Court in Sheets indicates, the public policy exception was meant to permit the courts to interfere with an employer's "exercise of managerial discretion" in cases where employers sought to punish employees for exercising their rights as good citizens. The Sheets Court relied on the following cases in other jurisdictions in creating the public policy exception:
 [O]ther jurisdictions that have found wrongful and actionable a discharge in retaliation for the exercise of an employee's right to: (1) refuse to commit perjury; Petermann v. International Brotherhood of Teamsters, 174 Cal.App.2d 184, 189, 344 P.2d 25 (1959); (2) file a workmen's compensation claim; Frampton v. Central Indiana Gas Co., 260 Ind. 249, 252, 297 N.E.2d 425 (1973); Sventko v. Kroger Co., 69 Mich. App. 644, 648-49, 245 N.W.2d 151 (1976); Brown v. Transcon Lines, 284 Or. 597, 603, 588 P.2d 1087 (1978); (3) engage in union activity; Glenn v. Clearman's Golden Cock Inn, Inc., 192 Cal.App.2d 793, 798, 13 Cal.Rptr. 769
(1961); (4) perform jury duty; Nees v. Hocks, 272 Or. 210, 216-19, 536 P.2d 512 (1975); Reuther v. Fowler Williams, Inc., 255 Pa. Super. 28, 31-32, 386 A.2d 119 (1978).
Sheet, 179 Conn. at 476 (Emphasis added.)
The public policy violations present in Sheets and the cases relied on by the Court in Sheets directly related to the reason for the termination. Mr. Sheets was terminated for attempting to get his employer to comply with the laws concerning the labeling of food. The plaintiffs in the other cases were terminated either for exercising a legal right or duty (jury participation) or for refusing to violate a law (refusing to commit perjury.) In this case, the plaintiff does not even claim that he was fired for exercising his rights as a good citizen. Rather, the public policy upon which the plaintiff relies involves the conduct of the employer in investigating or effecting the termination. Courts have uniformly stricken wrongful termination claims based upon allegedly tortious conduct by the employer during the termination process. Morris v. Hartford Courant, Co., supra,Carbone v. Atlantic Richfield Co., 204 Conn. 460, 528 A.2d 1137
(1987), Doherty v. Sullivan, 29 Conn. App. 736, 618 A.2d 56
(1992), Battista v. United Illuminaling Co., 10 Conn. App. 486, CT Page 7458523 A.2d 1356 (1987).
For the foregoing reasons the Motion to Strike the Third Count is granted.
Covenant of Good Faith and Fair Dealing
In the Second Count the plaintiff alleges a breach of the covenant of good faith and fair dealing. An at will employee cannot pursue an action for breach of an implied covenant of good faith and fair dealing unless his dismissal violates public policy. Magnan v. Anaconda Industries, Inc., 193 Conn. 558,479 A.2d 781 (1984). As stated above, the plaintiff has failed to allege that his termination violated an important public policy as required by Sheets. In Magnan the Court refused to allow the plaintiff to invoke the covenant of good faith and fair dealing to convert an employment at will to one requiring cause for termination and observed, "Where employment is clearly terminable at will, a party cannot ordinarily be deemed to lack good faith in exercising this contractual right." 193 Conn. at 572.
The Court in Magnan recognized that the implied covenant of good faith and fair dealing was "[e]ssentially . . . a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle, therefore, cannot be applied to achieve a result contrary to the clearly expressed terms of a contract."193 Conn at 567.
The Restatement (Second) Contracts 205 provides:
Duty of Good Faith and Fair Dealing
 Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.
 Comment a. Meanings of "good faith." Good faith is defined in Uniform Commercial Code 1-201 (19) as "honesty in fact in the conduct or transaction concerned." . . .Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . .
 Comment d. Good faith performance. Subterfuges and evasions violate the obligation of good faith in performance even though CT Page 7459 the actor believes his conduct to be justified. But the obligation goes further; bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.
 Illustrations 1. A, owner of a shopping center, leases part of it to B, giving B the exclusive right to conduct a supermarket, . . . During the term of the lease A acquires adjoining land, expands the shopping center, and leases part of the adjoining land to C for a competing supermarket. Unless such action was contemplated or is otherwise justified, there is a breach of contract by A. 6. A contracts to perform services for B for such compensation "as you, in your sole judgment, may decide is reasonable." After A has performed the services, B refuses to make any determination of the value of the services. A is entitled to their value as determined by a court.
 Comment e. Good faith enforcement. The obligation of good faith and fair dealing extends to the assertion, settlement and litigation of contract claims and defenses. . . . The obligation is violated by dishonest conduct such as conjuring up a pretended dispute, asserting an interpretation contrary to one's own understanding, or falsification of facts. It also extends to dealing which is candid but unfair, such as taking advantage of the necessitous circumstances of the other party to extort a modification of a contract for the sale of goods without legitimate commercial reason. See UCC § 2-209, Comment 2. Other types of violation have been recognized in judicial decisions: harassing demands for assurances of performance, rejection of performance for unstated reasons, willful failure to mitigate damages, and abuse of a power to determine compliance or to terminate the contract.
Notwithstanding that our Supreme Court has recognized the covenant of good faith and fair dealing as a rule of contract construction, the covenant is widely misused and plead as a separate cause of action which generally does nothing more than CT Page 7460 restate a breach of contract claim, or which complains of unfair treatment regardless of the presence of a contract. The plaintiff illustrated his misunderstanding of the covenant of good faith and fair dealing when he stated:
 [P]laintiff has alleged that defendants treated him unfairly, without respect, dishonestly and inequitably. (Complaint. ¶ 41.) This is a clear breach of the implied covenant of good faith and fair dealing.
Plaintiff's Memorandum in Opposition to Summary Judgment, p. 22.
The sections of Restatement § 205 set forth above make it clear that a breach of the covenant of good faith and fair dealing generally occurs where there is no other contractual breach, or in other words, where the party lacking good faith has adhered to the letter of the contract. For example, if an employer agreed that an employee could be terminated if he did not have an average or better evaluation on the anniversary of his hire date and the employer's supervisor purposely refrained from evaluating the employee (leaving him without an average or better evaluation), then the employer would not violate the terms of the employment contract if it fired the employee, but its actions would violate the covenant of good faith and fair dealing.
In this case the plaintiff has joined the company of the many who plead a breach of the covenant of good faith and fair dealing as if it were essentially identical to a breach of contract. Here the First Count alleges that the Corporate Defendants impliedly agreed that the plaintiff would only be fired for cause. It further alleges that the Corporate Defendants breached that contract by firing the plaintiff without cause. The Second Count realleges the allegations of the First Count, that is, that the Corporate Defendants breached covenant of good faith and fair dealing generally occurs where there is no other contractual breach, or in other words, where the party lacking good faith has adhered to the letter of the contract. For example, if an employer agreed that an employee could be terminated if he did not have an average or better evaluation on the anniversary of his hire date and the employer's supervisor purposely refrained from evaluating the employee (leaving him without an average or better evaluation), then the employer would not violate the terms of the employment contract if it fired the employee, but its actions would violate the covenant of good faith and fair CT Page 7461 dealing.
In this case the plaintiff has joined the company of the many who plead a breach of the covenant of good faith and fair dealing as if it were essentially identical to a breach of contract. Here the First Count alleges that the Corporate Defendants impliedly agreed that the plaintiff would only be fired for cause. It further alleges that the Corporate Defendants breached that contract by firing the plaintiff without cause. The Second Count realleges the allegations of the First Count, that is, that the Corporate Defendants breached the alleged implied contract, but contains no separate allegation as to how, other than by terminating his employment, the Corporate Defendants violated the covenant of good faith and fair dealing. The Second Count fails to state a cause of action for the breach of the implied covenant of good faith and fair dealing and is ordered stricken.
Intentional Infliction of Emotional Distress
In the Fifth Count the plaintiff alleges that the defendants engaged in actions which were extreme and outrageous and designed to cause plaintiff emotional distress. "In order for the plaintiff to prevail in a case for liability under . . . intentional infliction of emotion distress, four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337
(1986).
Whether the defendant's conduct and the plaintiff's resulting distress are sufficient to satisfy either of these elements is a question, in the first instance, for [the] court. Only where reasonable minds differ does it become an issue for the jury.Reed v. Signode Corp, 652 F. Sup. 129, 137 (D.Conn. 1986). Conduct which amounts to "insults, indignities, threats annoyances, petty oppressions, or other trivialities," will not support a claim for intentional infliction of emotional distress.Id. "The actor is never liable . . . where he has done no more than insist upon his rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." Peytan v. Ellis, 200 Conn. at 254 55. CT Page 7462
Most of the alleged actions of the defendants with respect to the plaintiff's termination were not extreme and outrageous if the defendants had a good faith reason to believe that the plaintiff had taken bribes from a customer. The plaintiff does not allege a lack of such a good faith belief, but does allege that at various times he denied wrongdoing. A termination of employment alone generally does not give rise to a cause of action for intentional infliction of emotional distress Morris,supra, at 681-82. However, the complaint contains allegations which go beyond claiming simply that the plaintiff suffered emotional distress as a result of the termination of his employment. When taken in a manner most favorable to the plaintiff, the Fifth Count states a cause of action for intentional infliction of emotional distress. Therefore, the Motion to Strike the Fifth Count is denied.
Negligent Infliction of Emotional Distress
To sustain a cause of action for negligent infliction of emotional distress, the plaintiff of has the burden of pleading and establishing (1) the defendant should have realized that its conduct involved an unreasonable risk of causing the distress and (2) that the distress, if caused, might result in illness or bodily harm. Montinieri v. Southern New England Telephone Co.,175 Conn. 337, 345, 398 A.2d 1180 (1978). For the reasons set forth above with respect to the claim for intentional infliction of emotional distress, the court will not strike the Sixth Count.
Negligent Misrepresentation
In the Seventh Count the plaintiff alleges that the statements which form the basis of his claim for breach of an implied contract also constitute negligent misrepresentations by the defendants. The principles governing a cause of action for negligent misrepresentation are set forth in § 552 of the Restatement (Second) Torts:
 One who, in the course of his business, profession or employment . . .supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
CT Page 7463
D'Ulisse-Cupo v. Board of Directors of N. D. H. S.,202 Conn. 206, 217-18, 520 A.2d 217 (1987) quoting Restatement (Second) Torts § 552 (1979).
The claim for negligent misrepresentation suffers from the same deficits as that for breach of an implied contract: it is difficult to fathom how the plaintiff relied on the policies and statements alleged to constitute representations that he would only be terminated for cause. However, the success of this count ultimately depends on factual interpretations and, therefore, the Motion to Strike the Seventh Count is denied.
To summarize, the Motion to Strike is granted as to the Second and Third Counts of the Complaint and denied as to the First, Fifth, Sixth, and Seventh Counts of the Complaint.
By the court, Aurigemma, J.