******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOSEPH COHEN *v.* ROBERT MEYERS ET AL.
(AC 38737)

Sheldon, Beach and Mihalakos, Js.

*Syllabus*

The plaintiff sought to recover damages from the defendant general contrac-
tor, M, and the defendant R Co., of which M was the president and sole
shareholder, for, inter alia, breach of a home construction contract. The
defendants thereafter filed a counterclaim alleging breach of contract,
defamation and intentional infliction of emotional distress. The matter
was tried to the court, which rendered judgment in part for the plaintiff,
concluding that R Co. had violated the Connecticut Unfair Trade Prac-
tices Act (CUTPA) (§ 42-110a et seq.) by failing to comply with the New
Home Construction Contractors Act (act) (§ 20-417a et seq.) and, inter
alia, by not registering as a new home construction contractor with the
Department of Consumer Protection while negotiating a contract with
the plaintiff. The court also rendered judgment in part for the defendants
on the counts of their counterclaim alleging breach of contract and
defamation. On the plaintiff's appeal and the defendants' cross appeal
to this court, *held*:

1. The plaintiff could not prevail on his claim that the trial court improperly
failed to pierce the corporate veil of R Co. and to hold M personally
liable for fraud and violation of CUTPA; although the court determined
that R Co. failed to comply with the act governing new home construction
contracts and that that failure constituted a violation of CUTPA, it
concluded that M's control of R Co., alone, was an insufficient basis on
which to pierce the corporate veil and that the plaintiff's proof did not
establish wilful, malicious, immoral or deceitful conduct by M, the record
having supported the court's finding that the plaintiff offered insufficient
evidence to satisfy the instrumentality test for disregarding a defendant's
corporate structure.

2. The trial court properly ruled in favor of M on his defamation claim, that
court having found that the plaintiff's statements that M was a cheat,
thief, liar, admitted criminal, and incompetent building contractor, and
that M had caused the death of a customer, cheated on his wife, or
contracted a venereal disease, were defamatory per se, and that the
plaintiff had not met his burden of proof as to his special defense that
the subject statements were true or substantially true; moreover, the
court properly rejected the plaintiff's claims that his statements were
privileged, as it found that the statements were made with actual knowl-
edge that they were false or with reckless disregard for whether they
were false, that actual malice had been proven by a preponderance of
the evidence, resulting in the loss of any conditional privilege, and that
the speech in question was solely a contrived means for malicious
harassment on a matter of private concern and, thus, was not constitu-
tionally protected as concerning a matter of public concern, and this
court adopted the reasoning of the trial court as a proper statement of
the facts and legal analysis on the issues raised on appeal.

3. The defendants could not prevail on their claim on cross appeal that the
trial court improperly awarded the plaintiff damages on his CUTPA
claim against R Co. because the plaintiff did not prove that he suffered
any compensable injury as a result of R Co.'s failure to comply with
the act governing new home construction contracts: the court, which
credited the plaintiff's testimony that he received the necessary disclo-
sures from R Co. as required under the act, and that it was highly likely
that he would not have contracted with or paid R Co. the sum of $54,750,
awarded the plaintiff compensatory damages for that amount, for which
he received little or no benefit and which represented his out-of-pocket
costs directly associated with the parties' contract; moreover, the fact
that the parties' contractual relationship ultimately deteriorated, which
also may have caused the plaintiff damages, was not a basis for conclud-
ing that the court's finding that R Co.'s CUTPA violation proximately
caused the plaintiff damages was clearly erroneous.

4. M could not prevail on his claim that the trial court improperly failed to

award him punitive damages on his defamation claim; that court, which noted that it had considered all of the evidence presented at trial, declined to award punitive damages to either party without setting forth the specific legal or factual bases for its decision, and in the absence of specific details set forth by the court on which it may have relied, it was presumed that the court properly applied the law and did not abuse the wide discretion afforded to it in making that determination.

5. M 's claim that the trial court erred in rejecting his claim for intentional infliction of emotional distress was unavailing; the court found that even if the plaintiff was engaged in a personal vendetta intended specifically to humiliate and harass M or to make him lose his job, the specific conduct of the plaintiff did not rise to the level of extreme and outrageous conduct as a matter of law, as required to impose liability for intentional infliction of emotional distress, the court having properly focused on the conduct on which M's claim was based and the manner in which the plaintiff undertook his campaign to harm M's personal and professional reputation, rather than the generalized characterizations of that conduct, regardless of the motivation behind it.

Argued May 25—officially released August 15, 2017

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Middlesex, where the defendants filed a counterclaim; thereafter, the matter was transferred to the judicial district of Hartford, Complex Litigation Docket, and tried to the court, *D. Sheridan, J.*; judgment in part for the plaintiff on the complaint and in part for the defendants on the counterclaim, from which the plaintiff appealed and the defendants cross appealed to this court. *Affirmed.*

*Christopher A. Klepps*, with whom was *Richard D. Carella*, for the appellant-appellee (plaintiff).

*Melissa S. Harris* and *Michael F. Dowley*, for the appellees-appellants (defendants).

*Opinion*

SHELDON, J. In this case arising from a home construction contract, both parties appeal from the judgment of the trial court. The plaintiff, Joseph Cohen, brought this action against the defendants, Robert M. Meyers and Robert M. Meyers, Inc. (RMMI), stemming from a contract for the construction of a new home to be built by RMMI on a lot of land that Cohen had owned for many years prior to entering into said contract. Cohen's nine count revised complaint alleged the following claims against Meyers: breach of contract, fraud, unjust enrichment, violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., statutory theft in violation of General Statutes § 52-564, and conversion. Cohen alleged the following claims against RMMI: breach of contract, rescission, and violation of CUTPA. The defendants filed an answer denying Cohen's allegations or leaving him to his proof, set forth various special defenses, and asserted counterclaims for breach of contract, defamation, and intentional infliction of emotional distress. Cohen denied the special defenses advanced by the defendants in response to his complaint. Cohen also denied or left the defendants to their proof as to their counterclaims and asserted special defenses to those counterclaims, claiming abandonment and fraud as to the breach of contract counterclaim, and truth and privilege as to the defamation counterclaim. The defendants denied Cohen's special defenses.

After a bench trial, the court, *D. Sheridan, J.*, filed a memorandum of decision in which it found in favor of Cohen on his CUTPA claim against RMMI, and awarded damages on that claim in the amount of $54,750. The court rejected all of Cohen's additional claims against the defendants. The court found in favor of RMMI on its counterclaim for breach of contract, but found that it had failed to prove damages resulting from that breach, and thus awarded it nominal damages in the amount of $1. The court found for Meyers on his defamation claim and awarded him noneconomic damages in the amount of $100,000. The court found in favor of Cohen on the defendants' counterclaim for the intentional infliction of emotional distress. The court declined to award punitive damages to either party.

On appeal, Cohen challenges the court's judgment in favor of Meyers, individually, on his claims for fraud and violation of CUTPA, asserting that the court erred in declining to pierce RMMI's corporate veil. Cohen also claims that the court improperly held him liable for defamation because his speech was protected by the first amendment, he did not make any of the allegedly defamatory statements against Meyers with actual malice, the court employed the wrong legal standard in determining the issue of malice, and each of his allegedly defamatory statements was substantially true even

though the burden of proof was assertedly on Meyers to prove that they were not.

In their cross appeal, the defendants first claim that the court erred in awarding damages on the plaintiff's CUTPA claim against RMMI because he failed to prove that he suffered any actual loss or injury as a result of the CUTPA violation. Meyers also claims that the court erred in failing to award punitive damages on his defamation claim and in rejecting his claim for intentional infliction of emotional distress. We affirm the judgment of the trial court.

The trial court found the following relevant facts. "In October, 1999, Cohen bought a parcel of undeveloped land within the town of Chester . . . known as 11 Kings Highway, with the intention of someday building a single-family home upon the property.

"At the time of Cohen's purchase of . . . 11 Kings Highway, a 'driveway' surfaced with sand and crushed gravel and protected by adjacent drainage swales, had been in place since 1987. When Cohen bought the lot in 1999, his 'understanding' was that the land was 'a fully buildable lot,' with approvals in place. Cohen also referred in his testimony to the property as an 'approved building lot.' The only additional permit or approval he understood he needed prior to commencing construction was for a septic system, which would require a satisfactory percolation test. Cohen testified that, based on discussions with the Chester zoning enforcement officer, which occurred in 1999 and again in 2002, he continued to believe that—except for septic—all approvals were in place and he 'had no concerns' about his ability to build a house on the property using the existing driveway for access and the existing drainage swales for erosion control.

"In 2005, the town of Chester Planning and Zoning Commission adopted new driveway regulations. While the existing driveway on the 11 Kings Highway property in Chester met the town's driveway requirements in place from 1987 to 2005, it did not comply with the requirements adopted in 2005.

"In April, 2009, Cohen undertook to obtain a percolation test and septic design for the property, which was later approved. Around the same time, Cohen hired designer Brian Buckley to prepare plans for a single-family home to be built on his property in Chester. Buckley provided Cohen several names of general contractors to consider for the construction of the home, one of which was RMMI. At that time, in April, 2009, RMMI possessed a valid new home construction contractor ('NHCC') registration.

"Robert M. Meyers is the president and sole shareholder of RMMI. At all times RMMI acted through Meyers, and Meyers has admitted that he had 'complete control and domination of all business and fiscal poli-

cies and procedures' of the corporation.

"Beginning in April, 2009, there was an exchange of e-mail correspondence between Cohen and Meyers, on behalf of RMMI, which continued sporadically through January, 2010. During that time period, on October 1, 2009, RMMI's NHCC registration lapsed. Additional e-mails were exchanged from January 19, 2010 through July 28, 2010. During this time period, the parties worked out the basic aspects of their agreement, and RMMI provided a draft of a contract to Cohen. Of course, RMMI did not possess a valid NHCC registration while making any of these communications or conducting these negotiations.

"In the last days of July, 2010, it became apparent that Cohen prepared to move forward with the building of the house. In preparation for the anticipated contract with Cohen, Meyers, on behalf of RMMI, took several actions. First, he reached an agreement with Cohen that the additional costs of land-clearing beyond that specified in their proposed written agreement would be split fifty-fifty. Cohen paid the sum of $1250 directly to the contractor, Stanley Burr, for one half the additional cost of the site-clearing cost of the property. Second, on July 30, 2010, Meyers renewed RMMI's NHCC registration. Third, on July 30, 2010, Meyers opened a commercial checking account at Citizens Bank in the name of RMMI.

"On August 2, 2010, Cohen and RMMI signed the written 'Agreement,' which is appended to the complaint and was exhibit 1 at the trial. The first paragraph of the agreement clearly and explicitly states that the contracting parties are Cohen and RMMI:

"AGREEMENT

"This Agreement, made on this 2nd day of Aug. 2010, by and between Joseph M. Cohen ('Owner') of 1060 Shermer Rd. Apt. 16 Northbrook, IL 60062-3736 and Robert M. Meyers, Inc. of 843 Haddam Quarter Rd. Durham, Connecticut ('Builder').

"Consistent with this recitation, the agreement is signed—once again clearly and explicitly—by RMMI, acting through its President, Robert M. Meyers. . . .

"Certain provisions of the agreement are especially pertinent to this dispute and it is worthwhile to set them out here in full:

"1. *DWELLING*: The Builder shall perform the work and supply all the materials to construct a single family dwelling on the property with all site improvements substantially in accordance with SCHEDULE A, the house drawing plan and Site plan. And SCHEDULE B, the specifications. (Such dwelling shall be referred to as 'dwelling.') The Builder reserves the right to: (i) substitute any materials of like or better quality; (ii) make minor deviations from the drawing/

plans and specifications; and (iii) in the event that there is a discrepancy between the drawing/plan and the specifications, the specifications shall control. . . .

"3. *PRICE AND PAYMENT SCHEDULE*: The Owner agrees to pay the Builder the sum of $229,000.00 for the construction of the Dwelling and site improvements, time being of the essence regarding the date of payment. The price shall be paid as follows:

a. $50,000.00 Upon execution of this agreement.
b. $40,000.00 Upon installation of septic system and digging hole for foundation.
c. $40,000.00 Upon pouring foundation and back-filling.
d. $40,000.00 Upon the main structure being framed and roofing installed.
e. $30,000.00 Upon siding and gypsum board being installed and rough mechanics being installed.
f. $20,000.00 Upon installation of flooring, cabinets, and completion of interior painting and tile.
g. Balance $9,000.00 Upon obtaining a Certificate of Occupancy.

"Notwithstanding the foregoing if a Certificate of Occupancy is not issued as a result of anything outside of this agreement, then the final payment shall be due as if the Certificate of Occupancy was issued on the date the Certificate of Occupancy was denied.

"In addition, the Owner acknowledges that there may be an additional cost not provided in this agreement for water service connection fees and Electric Power Company connection fees, including but not limited to any transformer, transformer Vaults, pull stations, etc., not shown on the site plan. . . .

"12. *ENTIRE AGREEMENT*: The Parties acknowledge that this agreement contains the entire understanding, terms, and conditions between the parties. This agreement cannot be changed orally, but only by agreement in writing signed by the party against whom enforcement of any waiver, change, modification, or discharge is sought. . . .

"15. *REPRESENTATIONS*: In addition to any other warranties or representations contained in this agreement, the Owner warrant[s] and represent[s] to the builder that:

a. The property is an approved building lot and the builder will be able to obtain a building permit upon application and without having to comply with any special requirements of Planning and Zoning, inland-wetlands commission, or any other governmental or quasigovernmental agency having jurisdiction over this property except as set forth in this agreement.

"At the time of the signing of the agreement, Cohen issued a check to RMMI for $50,000 in accordance with the 'PRICE AND PAYMENT SCHEDULE' of the agreement. The check was deposited into the Citizens Bank commercial checking account that had been opened a few days earlier.

"Prior to entering into the agreement, RMMI did not provide the plaintiff a written notice pursuant to the New Home Construction Contractors Act [(NHCCA)], Connecticut General Statutes § 20-417d (A), advising [Cohen] to (a) contact the Department of Consumer Protection regarding the contractor's registration status; (b) to inquire into whether any complaints had been filed against the contractor; and (c) to request a list of consumers of new homes constructed to completion by the contractor.

"At the time the agreement was signed, RMMI had been the subject of new home construction complaints to the Department of Consumer Protection . . . in 2001, 2004, 2006, and 2008.

"After signing the contract and receiving the first payment, RMMI commenced work at the site, including land-clearing, blasting, excavation, and placement of temporary forms. When laying out and excavating for the foundation footings for the house, RMMI rotated or 'pivoted' the axis of the foundation to avoid a rock outcropping. When Cohen learned of this, he expressed great concern, since the orientation of the house had been precisely planned so as to maximize the view from the house over the Connecticut River valley.

"On August 31, 2010, after receiving Cohen's concerns and complaints about the rotation of the foundation, Meyers informed Cohen in an e-mail that, 'Joe, if you want the foundation moved back, I will call the concrete contractor and have him move it back.'

"On August 10, 2010, Meyers went to the Chester town hall to file an application for a building permit. The Chester zoning enforcement officer, Judith R. Brown, informed Meyers that a building permit could not be issued because a driveway permit was required in order to obtain a building permit. Brown also required that Meyers file applications for a zoning permit and a driveway permit. A great deal of communication between Cohen and various town officials ensued, with Cohen pleading his case to all involved that the driveway should be 'grandfathered' and he should not be required to obtain a driveway permit.

"Despite Cohen's efforts, on September 1, 2010, the application for a driveway permit was denied because it did not meet the driveway standards set forth in the 2005 driveway regulation. On September 7, 2010, after meeting with the town engineer, Cohen sent an e-mail to the various town officials requesting a waiver of the driveway regulations. On September 13, 2010, Cohen

filed a formal application for the driveway waiver with the Board of Selectmen of the town of Chester.

"On September 21, 2010, the driveway waiver application was considered at a Board of Selectmen meeting that was attended by Cohen and Meyers. The waiver was denied pending information regarding turning radius requirements for emergency vehicles. On October 5, 2010, the waiver of the driveway regulations was approved at a meeting of the Board of Selectmen.

"On October 6, 2010, [Brown] wrote a letter to Cohen stating that the waiver was approved, but that before he could start driveway improvements, he was to arrange a preconstruction meeting with the driveway contractor, herself, and the town engineer, pay a $25 application fee, post a driveway bond in the amount of $1500, and provide a certificate of insurance prior to the issuance of a zoning permit.

"On October 8, 2010, Cohen sent an e-mail to Meyers, which attached a detailed list of 'issues for discussion' before restarting construction on the project. The list included driveway issues, building permit 'problems,' and various other items that Cohen claimed had increased the project cost by 5 to 10 percent. Cohen's list suggested a variety of paths to 'move forward,' ranging from shutting down construction temporarily or permanently, to completing the construction as quickly as possible, to entering into a new contract. In reply to Cohen's e-mail, Meyers stated that he was not responsible for the delay or the permit or driveway issues, and declared that Cohen was in breach of the contract, stating: '[t]his delay is costing me time and money. Reminder: You represented to me by contract that you have [an] approved building lot and that I should not have to be caused a delay from the town government. . . . Without a building permit, approved site plan and adjusted contract, this job is [stopped] and you remain in breach of contract.'

"For the next week, Cohen and Meyers continued to exchange e-mails blaming each other for various delays, discrepancies, problems, and cost overruns on the project. Cohen attempted to get Meyers to meet with the town and restart the building process, but Meyers refused to do so unless he could move forward with the existing contract 'without issues.' He interpreted Cohen's insistence on discussing topics such as delay and increased cost as 'nothing more than you trying to get me to pay for your misfortune.'

"On October 25, 2010, Cohen sent a certified letter to Meyers stating that the contract was 'under review' and directing him not to perform any additional work, make any expenditures, or order materials or services related to 11 Kings Highway.

"On November 10, 2010, [Brown], the Chester zoning enforcement officer, returned the building permit appli-

cation and checks to Meyers because she had been advised by Cohen that 'he will not be going forward with his plans to build at 11 Kings Highway at this time.'

"Ultimately, on December 1, 2010, Cohen notified RMMI via certified letter that the contract was terminated for cause.

"Cohen then embarked upon a relentless pursuit of his grievances against Meyers that has continued unabated to the present. The catalog of e-mails, letters, newspaper articles, and other writings which memorialize long and bitter conflict is impressive in its dimensions and in its vitriol. What follows are excerpts which are particularly relevant to the issues in this lawsuit.

"On January 17, 2011, in an e-mail to Mr. Meyers, Mr. Cohen stated:

" 'Please share the following with your wife and your attorney: Time is up—this week I begin filing formal complaints and notifying officials in all Connecticut River Valley Durham and surrounding towns about my dispute with you. I also intend to [take out] an ad in the Middletown Press and other publications (I am 100 [percent] serious). When I call you out as a liar, cheat, thief and lawbreaker—it will all be true! When your wife comes home from work at Middlesex Memorial saying she is humiliated; when your children ask what is wrong with you; when your neighbors (who I contact by mail) start staring at you strangely, you will know you blew your last chance to fix things. And every building official and state official in the Durham-Meriden-East Haddam corridor will have your number. As for being a licensed building inspector—I doubt it since I will track you and make sure every community gets a full accounting of your track record . . . . I will be visiting officials with formal letters of complaint in East Haddam, Durham and Meriden as soon as possible. You are going to be under the gun of officials and the public. . . . [You have] left me no choice but to make you pay for it.'

"On January 18, 2011, Mr. Cohen began exchanging e-mails with George P. Gombossy, a syndicated consumer columnist for numerous Connecticut newspapers. Cohen told Gombossy:

" 'thanks for getting involved in this. meyers' llc includes his wife, so I am going to put her name and work affiliation in everything I do going forward. i have a feeling when middlesex memorial sees their name getting trashed with an employee's they may put the screws to her.'

"(Lowercase in original.)

"On January 19, 2011, Cohen sent another e-mail to Meyers, stating:

" 'Your stupidity is overwhelming. I have tried to be nice to you because you are a small man without much of a life. What little you have is about to be diminished. . . . When you are sitting around with no work or selling light bulbs at the local store, remember you blew any chance you had to salvage your reputation.'

"In the wake of these e-mails, as he suggested he would, Cohen began communicating with various state and local officials regarding Meyers. He also, as he suggested he would, began to include Meyers' wife, Christine A. Meyers, as part of his communications and requests for information. Cohen justified his efforts directed at Christine Meyers because she was a secretary of RMMI and Meyers' 'business partner.' The former is true, but as to the latter, no competent evidence was submitted as to any active participation by Mrs. Meyers in any of the business affairs of RMMI, or in the construction project at 11 Kings Highway.

"On January 19, 2011, Cohen forwarded a Freedom of Information Act ('FOIA') [General Statutes § 1-200 et seq.] request to Richard McManus, building official for Durham (copied to Laura Francis, first selectman), requesting any and all building permits or other permits for construction or renovations issued or requested by Robert M. Meyers, Robert M. Meyers Inc., LLC, Robert Meyers, and Christine A. Meyers. Thereafter, Cohen met personally with McManus. Cohen also met with Keith Darin, then building official for East Haddam, to review files of houses built by RMMI.

"Cohen made a FOIA request directed to the Department of Consumer Protection, asking for all complaints against RMMI and Meyers. On January 31, 2011, Cohen filed a complaint with the Department of Consumer Protection related to the construction at 11 Kings Highway in Chester, but also alleging that Meyers performed new home construction, while not registered, at 24 Alger Road, in East Haddam. . . . [Cohen] began to exchange e-mails with Terence Zehnder, the investigator for the Department of Consumer Protection, and in a March 29, 2011 e-mail to Zehnder, stated, 'Meyers is stubborn, not smart, arrogant and has gotten away with pulling crap for years.' To resolve [Cohen's] complaint, RMMI provided an assurance of voluntary compliance to the commissioner of the Department of Consumer Protection and paid a civil penalty of $250 on April 19, 2011.

"On January 3, 2012, Cohen sent a three page letter to the Middlefield Board of Selectmen, stating, '[i]t is my belief [Meyers] is a liar, cheat, commits fraud, steals, is not competent as a builder, and lacks proper respect for the law. Robert Meyers has . . . [w]orked (in 2009/ 2010) as a builder while not registered/licensed (a criminal offense) . . . [p]erformed construction work

(2010) on a new house without getting a building permit . . . [a]llegedly threatened to kill a customer in a dispute over the customer's house . . . [i]gnored another town's building inspector and planned to go against his order (2010), created and submitted a fake document into a court proceeding (2011).' Cohen also states: 'Robert M. Meyers has disdain for the law, the court system and the truth. . . . [I]t is my experience and belief Robert M. Meyers is a dishonest, deceitful, incompetent contractor.' Cohen thereafter went to a Middlefield Board of Selectmen meeting to read aloud the content of his letter, and that appearance was reported by the press. On January 13, 2012, an article appeared in the 'Town Times' headlined, 'Chester Resident Complains about Middlefield Building Inspector at Selectmen's Meeting,' reporting that Cohen stated that 'Meyers does not have respect for the law, authority or the truth and felt he was fundamentally dishonest and deceitful.'

"On September 7, 2012, Cohen sent a letter to Joseph V. Cassidy, acting state building inspector, and copied the letter to Donald DeFronzo, acting commissioner of the Department of Construction Services; Daniel Tierney, deputy state building inspector; Attorney General George Jepsen; and William M. Rubenstein, commissioner of the Department of Consumer Protection. In the letter, Cohen stated: 'I believe Mr. Meyers may have obtained his building inspector's license under false pretenses and/or is not qualified to be licensed by the state of Connecticut.' Cohen also stated that Meyers was guilty of 'a serious criminal violation' when he built and sold a new house at 24 Alger Road in East Haddam. In the letter, Cohen states that Meyers is 'an alleged liar, cheat and thief—an admitted criminal who violated state building and consumer protection laws'; and [that] Meyers is 'something of a Jekyll and Hyde personality: Charming until he gets your money, then a sociopath who enjoys taunting and threatening in response to legitimate questions about business practices, competence and integrity.'

"On September 27, 2012, Meyers was disclosed as an expert witness who was expected to be called at the trial of this case. The disclosure stated that Meyers 'is expected to testify that, in his opinion, there was no violation of any codes regarding the work done by Mr. Meyers at the property subject to this lawsuit prior to the issuance of any building permit by the town of Chester. Mr. Meyers may also give his opinion that the town of Chester did not have any governing rules or regulations which would have resulted in a violation of the work done at the property prior to the issuance of a building permit by the town of Chester.' . . .

"Upon learning of this expert disclosure, Cohen began a new, more aggressive and more strident round of communications with state and local officials, pur-

portedly 'to ascertain information related to Cohen's prosecution in this case.' . . .

"Cohen made a FOIA request to the [Department of Construction Services] (the state building inspector's office) for documents related to Meyers' service as a building official in East Haddam. After reviewing the response, on October 10, 2012, Cohen sent a letter to the state building official, in which he stated that Meyers had 'a long history of consumer complaints and skirting the law' . . . . He complained that Meyers 'stole most of the $53,500 I gave him . . . .' He expressed a 'personal belief' that 'Mr. Meyers is a liar, cheat, thief and incompetent as a builder and would not be deserving of a job in public service.'

"On October 16, 2012, Cohen spoke at a meeting of the Middlefield Board of Selectmen, stating, among other things, that Meyers was not registered as a new home construction contractor in 2009/2010 when he built a home at 24 Alger Road, a criminal violation of state law for which he was not prosecuted, and that at the time he passed the state test for the building official, he was not licensed and was in 'serious criminal violation of the very rules he was charged with upholding.'

"On October 23, 2012, Cohen sent a letter to the first selectman of the town of Middlefield stating that Meyers had lied on his job application. In the letter, Cohen also stated that a customer had alleged that Meyers threatened to kill him.

"Cohen spoke again at a Middlefield Board of Selectmen meeting on November 5, 2012, again claiming that it was a criminal violation for Meyers to build the house at 24 Alger Road without licensing as a new home contractor.

"On November 26, 2012, Cohen sent another letter to the Middlefield Board of Selectmen, letting them know of the pending lawsuit and complaints lodged against Meyers, claiming that $53,500 was 'stolen' and he was left only with a torn-up piece of property. Cohen stated: '[Y]ou cannot reason with a man who lies, cheats and steals with a cold heart; a man I know who will laugh in your face and taunt you, telling you he has your money and it is now his money . . . .'

"On April 10, 2013, Cohen sent a letter to Angie Martinez, a consumer information representative in the fraud division of the Department of Consumer Protection, stating, '[i]t is my contention now that Robert M. Meyers, doing business as Robert M. Meyers, Inc., had for the past decade or more operated an *ongoing criminal enterprise disguised as a building contracting business.* Mr. Meyers engaged in fraud, theft/larceny, embezzlement, violation of consumer protection laws, elder abuse and other criminal behavior . . . .'

"On April 29, 2013, Cohen wrote again to the first selectman of the town of Middlefield, stating: 'I have

been working with state and federal authorities to bring criminal and other actions against Mr. Meyers for alleged crimes including larceny, fraud and abuse—charges I believe Mr. Meyers is guilty of . . . I look forward to the day when news trucks are lined up outside your Town Hall building to conduct live broadcasts . . . Meyers, through his corporate entity . . . took money from me that Mr. Meyers apparently embezzled from his corporation and used for his personal expenses . . . Meyers lied, cheated and stole from [one of his customers, John Christopher, and his wife, Sarah] and that led to Mr. Christopher's death. It is an awful tale, but something not out of character when it comes to Mr. Meyers, who is one of the most despicable people I have ever come across.'

"Sometime in the summer of 2013, Cohen created an Internet website entitled 'Housebuilder from Hell; Robert 'Bob' Meyers' at the address www.robertmeyer-sinfo.com. The website was paid for and maintained by Cohen, and consists of pages of text with limited graphics. Cohen confirmed that he has complete control over the content of the website. Several statements on the website are especially pertinent to this lawsuit:

- " 'Certainly, I did not make Meyers into what he is—a liar, thief cheat, incompetent and lawbreaker.'

- " 'Meyers, I learned in my query into his past, thinks it is okay to cheat on his wife, contract venereal disease, and advertise for dates on the Internet . . .'

- " 'Bob Meyers is a thug, a criminal and expert liar . . .'

- " 'Let me tell you some of the things Bob Meyers does not want you to know, all of which I would contend reflect on Meyers' poor moral character, his criminal and anti-social inclinations, and that confirm he is a liar and a cheat and a lawbreaker. They include . . . 1. Bob Meyers had an affair while married. At some point, Bob Meyers contracted venereal disease . . . Since I know Bob Meyers at one point was trolling the Internet for women using my money, let this be a warning: practice safe sex (some venereal disease infections cannot be cured), and the safest sex is to choose your relationships carefully and take other precautions . . .'

- " 'I did not know at the time that Meyers had a history of lawbreaking and complaints, that his wife had tired of his lack of ability to be a decent husband and partner in marriage, or that Meyers' behavior was not unlike that of a criminal who refuses to accept responsibility for his actions.'

"The court credited Meyers' testimony that he has been affected physically, mentally, and emotionally by Cohen's conduct. Meyers testified to sleepless nights, anxiety, tremendous stress, jitters, night sweats, a pit in his stomach, and constantly worrying what would

happen next. Meyers testified that he often goes home, closes the blinds, seals himself in and pulls a blanket over his head. He admitted to thoughts of suicide as a way to 'stop all of the pain.' He summed up his situation by remarking that Cohen's accusations of him killing a man, and being a liar, a thief and a criminal have turned his life into 'a pile of crap.' Meyers' changes in behavior, outlook, and demeanor over the past few years were corroborated by the testimony of various friends and relations." (Citations omitted; emphasis in original; footnotes omitted.)

On the basis of the foregoing facts, and additional facts that will be set forth as necessary, the court concluded, inter alia: "RMMI's failure to register with the Department of Consumer Protection as a new home construction contractor under the NHCCA, while at the same time negotiating a contract for new home construction, is a violation of the [NHCCA]. RMMI's failure to provide the plaintiff with the written notice required by § 20-417d (A) prior to entering into the agreement is also a violation of the NHCCA. A violation of the NHCCA, General Statutes § 20-417a et seq., constitutes a per se violation of [CUTPA]. As a result of the CUTPA violation established in count seven, the plaintiff is entitled to 'actual damages' under General Statutes § 42-110g (a)." The court credited Cohen's testimony that "he would have acted differently had he received proper NHCCA disclosures from RMMI," and thus [rendered] judgment in favor of Cohen against RMMI, and awarded him actual damages in the amount of $54,750 on his CUTPA claim. The court found in favor of RMMI on its counterclaim for breach of contract, but found that damages were not proven and thus awarded nominal damages in the amount of $1. The court found in favor of Meyers against Cohen on his defamation claim and awarded Meyers noneconomic damages in the amount of $100,000. The court rejected the parties' remaining claims against each other.[1]

The parties thereafter filed motions to reargue. First, Cohen sought reargument, inter alia, on the grounds that the court erred in summarily dismissing his claims for fraud, unjust enrichment, statutory theft and conversion against Meyers individually. Cohen argued that the court erred in declining to pierce the corporate veil and to hold Meyers individually liable for his conduct, and that its decision was inconsistent, in that it "concluded that RMMI violated a statutory duty by failing to comply with the NHCCA in violation of CUTPA [but] . . . . that Meyers did not use the corporate form to violate a statutory duty or perpetuate a fraud." Cohen argued: "[T]he court's express findings that Meyers had complete control and domination over RMMI, that RMMI violated an express statutory duty and engaged in unfair and deceptive practices, and that such violation was the cause of the plaintiff's damages, necessitates a finding that Meyers used the corporate form to violate a

statutory duty."

The court disagreed, and issued an order on December 3, 2015, holding, inter alia: "[T]he court rejects [Cohen's] contention that the facts found by the court in its memorandum of decision necessarily compel a finding that Meyers used his control and domination of the corporation to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [Cohen's] legal rights."

Meyers sought reargument of the court's refusal to award him punitive damages on his defamation claim and challenging the court's finding that Cohen's actions were not so extreme and outrageous as to support a claim of intentional infliction of emotional distress. The court denied Meyers' motion.

This appeal and cross appeal followed. Additional facts will be set forth as necessary.

I

PLAINTIFF'S APPEAL

A

Cohen first claims that the court erred in declining to pierce the corporate veil of RMMI, and thus to hold Meyers personally liable for fraud and violation of CUTPA. We are not persuaded.

"A court's disregard of an entity's structure is commonly known as piercing the corporate veil." (Internal quotation marks omitted.) *Litchfield Asset Management Corp.* v. *Howell*, 70 Conn. App. 133, 148 n.10, 799 A.2d 298, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002). "Ordinarily the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." (Internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 557, 447 A.2d 406 (1982). "Whether the circumstances of a particular case justify the piercing of the corporate veil presents a question of fact. . . . Accordingly, we review the trial court's decision whether to pierce [a party's] corporate veil under the clearly erroneous standard of review." (Citations omitted; internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 234, 990 A.2d 326 (2010).

We have recognized two tests for disregarding a defendant's corporate structure: the instrumentality rule and the identity rule. On appeal, Cohen claims that he satisfied the requirements of the instrumentality rule, and thus that the court erred in declining to pierce the corporate veil.[2] "The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock con-

trol, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." (Internal quotation marks omitted.) Id., 232.

In declining to pierce RMMI's corporate veil under the instrumentality rule, the trial court explained: "It is admitted that Meyers singlehandedly owned and operated RMMI on a day-to-day basis. But, the fact that a sole stockholder of a corporation is in exclusive control of the company's finances and business practices, standing alone, is an insufficient basis in itself to pierce the corporate veil. While control is a factor, '[o]f paramount concern is how the control was used, not that it existed.' . . .

"In this respect, [Cohen] has failed completely to offer any evidence that Robert M. Meyers, the individual, used the corporate form to perpetrate a fraud. The evidence offered by [Cohen] does not justify transforming a breach of contract claim against a corporation into a personal obligation of the corporation's principal. . . .

"[Cohen] offered no evidence to suggest that Meyers did not respect and observe the laws which afford him the right to form and manage a corporation of which he was the sole shareholder. RMMI had its own accounts, made payments to and from those accounts and conducted regular business as a general contractor, and apparently existed for years on its own, separate and distinct from . . . Meyers as an individual. Granted, the plaintiff offered evidence that funds from the RMMI account were used to pay bills of Meyers that he should have paid personally. But, Robert Gollnick . . . RMMI's accountant, testified that all those payments were accounted for and reflected on the balance sheet as loans to a company officer. Eventually, Meyers had to put money back into the corporation to offset the personal payments that were made from [the] corporation. In sum, [Cohen]'s evidence that . . . Meyers used the corporate form as a vehicle to commit fraud or dishonest acts consists of vague allusions and speculation, and thus was completely unpersuasive."

The court thus concluded that Cohen had "offered insufficient evidence to satisfy . . . the instrumentality . . . test," and thus rejected his attempt to pierce RMMI's corporate veil.

On appeal, Cohen claims that he satisfied the instru-

mentality test, and thus that the court should have pierced the corporate veil and held Meyers individually liable for violating CUTPA. Cohen's claim is based upon the same argument that he raised in his motion to reargue—that the trial court's determination that he failed to prove that Meyers exercised his control over RMMI to commit fraud or wrong or to perpetrate the violation of a statutory or other positive legal duty is inconsistent with its determination that RMMI, while under the control of Meyers, violated a statutory duty to Cohen under the NHCCA. In other words, Cohen contends that the trial court's own factual findings proved that he satisfied the instrumentality test. The court summarily rejected "[Cohen's] contention that the facts found by this court in its memorandum of decision necessarily compel a finding that Meyers used his control and domination of the corporation to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [Cohen's] legal rights." Although the court determined that RMMI had failed to comply with the NHCCA, and that that failure constituted a violation of CUTPA, the court concluded: "The plaintiff's proof in this case did not establish wilful, malicious, immoral or deceitful conduct." The court's determination that Cohen failed to satisfy the instrumentality test is supported by the record and he fails now, as he did before the trial court, to demonstrate that RMMI "did not serve a legitimate business purpose, or that failing to pierce its corporate veil and hold [Meyers] personally responsible would perpetrate a fraud or other injustice." We therefore cannot conclude that the court's ruling was clearly erroneous.

B

Cohen also challenges the court's judgment against him on Meyers' counterclaim for defamation. By way of special defense to Meyers' counterclaim, Cohen alleged that he should not be held liable for defamation because his remarks concerning Meyers were true. Cohen also alleged that his remarks were privileged based upon his "right to bring forth complaints to the Department of Consumer Protection regarding the unscrupulous and unlawful actions of [Meyers] which violate consumer protection statutes" and his right to make such statements in prosecuting this action. Cohen also argued, in his posttrial brief, that his statements regarding Meyers involved matters of public concern and thus were constitutionally protected.[3] The trial court found that Cohen's statements regarding Meyers were defamatory per se. The court further found that Cohen's arguments in defense of those statements unavailing. We agree with the trial court.

We begin by setting forth the general principles of law that are pertinent to our analysis of Cohen's challenge to the trial court's defamation ruling against him. "A

defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him . . . ." (Internal quotation marks omitted.) *Gleason* v. *Smolinski*, 319 Conn. 394, 431, 125 A.3d 920 (2015). "Defamation is comprised of the torts of libel and slander: slander is oral defamation and libel is written defamation." (Internal quotation marks omitted.) Id., 430 n.30. To establish a prima facie case of defamation at common law, the plaintiff must prove that "(1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." (Internal quotation marks omitted.) Id., 430.

Statements deemed defamatory per se are ones in which the defamatory meaning of the speech is apparent on the face of the statement. *Battista* v. *United Illuminating Co.*, 10 Conn. App. 486, 491–92, 523 A.2d 1356, cert. denied, 204 Conn. 802, 803, 525 A.2d 1352 (1987). Our state has generally recognized two classes of defamation per se: (1) statements that accuse a party of a crime involving moral turpitude or to which an infamous penalty is attached, and (2) statements that accuse a party of improper conduct or lack of skill or integrity in his or her profession or business and the statement is calculated to cause injury to that party in such profession or business. See *Moriarty* v. *Lippe*, 162 Conn. 371, 383–84, 294 A.2d 326 (1972) (slander per se); *Proto* v. *Bridgeport Herald Corp.*, 136 Conn. 557, 565–66, 72 A.2d 820 (1950) (libel per se).

"When the defamatory words are actionable per se, the law conclusively presumes the existence of injury to the plaintiff's reputation. [The plaintiff] is required neither to plead nor to prove it." (Internal quotation marks omitted.) *Lowe* v. *Shelton*, 83 Conn. App. 750, 766, 851 A.2d 1183, cert. denied, 271 Conn. 915, 859 A.2d 568 (2004). "Whether words are actionable per se is a question of law for the court . . . All of the circumstances connected with the publication of defamatory charges should be considered in ascertaining whether a publication was actionable per se. The words used, however, must be accorded their common and ordinary meaning, without enlargement or innuendo." (Citations omitted.) *Miles* v. *Perry*, 11 Conn. App. 584, 602–603, 529 A.2d 199 (1987).

"It is well settled that for a claim of defamation to be actionable, the statement must be false . . . and under the common law, truth is an affirmative defense to defamation . . . the determination of the truthfulness of a statement is a question of fact . . . ." (Internal quotation marks omitted.) *Gleason* v. *Smolinski*, supra, 319 Conn. 431. "Contrary to the common law rule that

required the defendant to establish the literal truth of the precise statement made, the modern rule is that only substantial truth need be shown to constitute the justification. . . . It is not necessary for the defendant to prove the truth of every word of the libel. If he succeeds in proving that the main charge, or gist, of the libel is true, he need not justify statements or comments which do not add to the sting of the charge or introduce any matter by itself actionable. . . . The issue is whether the libel, as published, would have a different effect on the reader than the pleaded truth would have produced." (Citations omitted; internal quotation marks omitted.) *Goodrich* v. *Waterbury Republican-American, Inc.*, 188 Conn. 107, 112–13, 448 A.2d 1317 (1982).

"A defendant may shield himself from liability for defamation by asserting the defense that the communication is protected by a qualified privilege. . . . When considering whether a qualified privilege protects a defendant in a defamation case, the court must resolve two inquiries. . . . The first is whether the privilege applies, which is a question of law over which our review is plenary. . . . The second is whether the applicable privilege nevertheless has been defeated through its abuse, which is a question of fact. . . . In a defamation case brought by an individual who is not a public figure, the factual findings underpinning a trial court's decision will be disturbed only when those findings are clearly erroneous, such that there is no evidence in the record to support them. . . . Finally, to the extent that a litigant challenges the legal standard that is required to establish that a privilege has been defeated, that issue is a question of law over which our review is plenary." (Citations omitted.) *Gambardella* v. *Apple Health Care, Inc.*, 291 Conn. 620, 628–29, 969 A.2d 736 (2009).

"Qualified privileges may be defeated by a showing, by a preponderance of the evidence . . . of actual malice, also known as constitutional malice, or malice in fact." (Citation omitted.) *Gleason* v. *Smolinski*, supra, 319 Conn. 433 n.32.[4] "Actual malice requires that the statement, when made, be made with actual knowledge that it was false or with reckless disregard of whether it was false. . . . A negligent misstatement of fact will not suffice; the evidence must demonstrate a purposeful avoidance of the truth." (Internal quotation marks omitted.) *Chadha* v. *Charlotte Hungerford Hospital*, 97 Conn. App. 527, 537–38, 906 A.2d 14 (2006). Malice is rarely subject to proof by direct evidence but is often proved only by inference through an accumulation of circumstantial evidence. With the foregoing legal principles in mind, we review the trial court's findings and legal conclusions.

In considering Meyers' defamation claim, and Cohen's defenses to it, the trial court noted, inter alia: "There does not appear to be serious debate between

the parties that the statements in question—that Meyers is a 'cheat,' 'thief,' 'liar,' 'admitted criminal,' and incompetent building contractor, or that he caused the death of a customer, cheated on his wife, or contracted a venereal disease—if false, and if not protected by a privilege, would be considered defamatory. The statements, considered separately or in combination, would certainly expose a person to scorn or contempt, cause him to be avoided, or injure him in his business or trade."

The court parsed Cohen's various statements regarding Meyers into three categories: those that accused him of a "crime involving moral turpitude or to which an infamous penalty is attached (e.g., 'thief,' 'admitted criminal,' or that he caused the death of a customer); those that accused him of improper conduct or lack of skill or integrity in his profession or business (. . . 'cheat,' 'liar,' and an incompetent building contractor)'; and those that fall into a grey area—namely, that Meyers cheated on his wife or contracted venereal disease.' " The court found that Cohen's statements concerning Meyers were defamatory per se.

Turning to Cohen's defense that all of his statements concerning Meyers were true or substantially true, the court first rejected Cohen's argument that Meyers bore the burden of proving the falsity of the defamatory statements at issue herein, explaining that, having asserted truth as a special defense, it was his burden to prove the truth or substantial truth of those statements. The court then found: "Several defamatory statements of Cohen stretch the test for 'substantial truth' past its breaking point."[5] The court thus concluded that Cohen had not met his burden of proof as to the special defense of truth, and that recovery for defamation was not precluded on that basis.

The court then went on to address Cohen's claims of privilege. The court rejected those claims, finding as follows: "The court believes that the direct and circumstantial evidence in the record of this case abundantly supports a finding that Cohen's statements regarding Meyers stealing, committing criminal acts, causing a death, contracting venereal disease, and having extramarital affairs were made with actual knowledge that they were false or with reckless disregard for whether they were false."[6] The court further concluded: "Having patiently and exhaustively reviewed the entire record, the court is persuaded that Cohen's departures from the truth were in fact motivated by spite or ill will—a burning desire to destroy Meyers personally and professionally that went far beyond aggressive litigation tactics or a good faith interest in protecting the public good. This is reflected at the very outset of this dispute in the January, 2011 e-mails he sent to Meyers and others when he promised to 'call you out as a liar, cheat, thief and lawbreaker. . . . You are going to be under

the gun of officials and the public. . . . [You have] left me no choice but to make you pay for it' and continues throughout, right up until the vehement and caustic text of the 'Housebuilder from Hell' website. That publicly expressed intent to inflict harm, coupled with the fact that Cohen—when he wanted to—was fully capable of restricting his comments about [Meyers] to statements that were true, persuades the court that the accusation [that] Meyers 'caused' a death was deliberately made in purposeful avoidance of the truth.

"Without discussing in detail, the court finds that a similar analysis applies to Cohen's deliberate use of the terms 'thief' and 'criminal' to refer to Meyers, and his website's disclosure that Meyers 'cheated on his wife' and 'contracted a venereal disease.' These statements were all made in reckless disregard for whether they were false and in purposeful avoidance of the truth, as part of a cruel and vindictive effort to inflict injury upon Meyers. Actual malice has been proven to the court by a preponderance of the evidence; therefore, any conditional privilege has been lost, and recovery for defamation is not precluded."

In his posttrial brief, Cohen also claimed that his comments about Meyers were constitutionally protected because they were matters of public concern "relating to both Meyers as a builder with whom multiple consumers had made prior complaints and a lawsuit, and Meyers as a building official using his office to obtain building code interpretations for his own benefit." The court also rejected that claim, finding as follows: "[H]aving reviewed the entirety of the record and heard the testimony, the court concludes that, despite the important setting in which the statements were made, the content of the message and the context in which they were published makes it clear that they [were] not in furtherance of an uninhibited, robust, and wide open debate on matters concerning public affairs. Their purpose was solely to harass and humiliate Meyers and perhaps induce the town of Middlefield to prematurely end his employment, perhaps so as to avoid a public relations embarrassment. The statements were published against the background of a private business dispute that had mushroomed into a contentious, vitriolic, and extremely uncivil lawsuit. The court finds that Cohen's remarks were part of an extended campaign of retaliation and revenge against Meyers that had everything to do with their private dispute, and little if anything to do with Meyers' employment as building official or, for that matter, building officials in general. . . . [T]he statements were not 'intended to persuade . . . with regard to a matter of public concern, [but] rather [to] merely torture [him] gratuitously with regard to a purely private matter.' "

The court thus concluded: "[T]he court finds that the speech in question is solely a contrived means for

malicious harassment on a matter of private concern, and is therefore not entitled to protection under the first amendment to the [United States] constitution.''

On appeal, Cohen claims that the court improperly held him liable for defamation because his speech was protected by the first amendment, he did not make any of the allegedly defamatory statements with actual malice, the court employed the wrong legal standard in determining malice, and that he had proven that each of the allegedly defamatory statements was substantially true even though the burden of proof was on Meyers to prove that they were not.

We have examined the record on appeal and considered the briefs and the arguments of the parties, and conclude that the trial court properly ruled in favor of Meyers on his defamation claim against Cohen. Because the trial court thoroughly addressed the arguments raised in this appeal, we adopt its well reasoned decision on the defamation claim, as quoted extensively herein, as a proper statement of the facts and legal analysis on the issues raised in this appeal. Any further discussion by this court would serve no useful purpose. See, e.g., *Woodruff* v. *Hemingway*, 297 Conn. 317, 321, 2 A.3d 857 (2010).

II

DEFENDANTS' CROSS APPEAL

A

On cross appeal, the defendants first claim that the court erred in awarding damages on Cohen's CUTPA claim against RMMI because he did not prove that he had suffered any compensable injury as a result of RMMI's failure to comply with the NHCCA. The defendants argue that any injury suffered by Cohen was caused, instead, by his own refusal ''to submit the driveway permit fee, bond and certificate of insurance in order to obtain a building permit and continue construction,'' and not their failure to make NHCCA disclosures. The defendants thus claim that the court erred in awarding damages on Cohen's CUTPA claim because he failed to prove that he suffered an injury or actual loss as a result of the CUTPA violation. We disagree.

The trial court determined that, as a result of RMMI's CUTPA violation, Cohen was entitled to actual damages pursuant to § 42-110g (a), which provides in relevant part: ''Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. . . .'' The court noted: ''Actual damages under CUTPA have been defined to include loss and expenses incurred by the CUTPA plaintiff as a result of a violation of the act,

*Prishwalko* v. *Bob Thomas Ford, Inc.*, 33 Conn. App. 575, 587, 636 A.2d 1383 (1994)."

With those legal principles in mind, the court credited Cohen's testimony that, "had he received the necessary disclosures from RMMI as required by the NHCCA, it is highly likely that he would not have contracted with RMMI, and would not have paid RMMI the sum of $54,750." The court further explained that Cohen had little to show for the $54,750 that he had paid to RMMI and that, if he had contracted with another party, it is reasonably probable that sum would have gone toward the cost of construction of a "completed home instead of a minimally excavated and prepared lot." The court thus awarded Cohen compensatory damages in the amount of $54,750—representing out-of-pocket costs directly associated with the contract in question—for a violation of CUTPA.

The issue of whether Cohen suffered an ascertainable loss as a result of RMMI's CUTPA violation is a question of fact, which we review under the clearly erroneous standard. *D'Angelo Development & Construction Corp.* v. *Cordovano*, 121 Conn. App. 165, 182, 995 A.2d 79, cert. denied, 297 Conn. 923, 998 A.2d 167 (2010).

Here, the court based its damages award on Cohen's testimony that he would not have signed the contract with RMMI in the first place if he had received the proper NHCCA disclosures, and thus awarded Cohen compensatory damages for the money he had paid to RMMI, for which he received little to no benefit. The court's conclusion is supported by the trial record. The fact that the contractual relationship between the parties ultimately deteriorated, and that, too, may have caused Cohen damages, is not a basis for concluding that the court's finding that RMMI's CUTPA violation proximately caused him damages was clearly erroneous.

B

Meyers also claims that the court erred in failing to award punitive damages on his defamation claim. We disagree.

"In awarding punitive damages . . . [t]he trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion." (Internal quotation marks omitted.) *Bhatia* v. *Debek*, 287 Conn. 397, 420, 948 A.2d 1009 (2008). "Such damages, however, are not awarded as a matter of right, but rather as a matter of discretion, to be determined by the [court] upon a consideration of all the evidence . . . ." (Internal quotation marks omitted.) *DeVito* v. *Schwartz*, 66 Conn. App. 228, 236, 784 A.2d 376 (2001).

In addressing the parties' claims for punitive damages, the court noted that it had considered all of the evidence presented at trial and declined to award puni-

tive damages to either party. The court did not otherwise set forth the specific legal or factual bases for that decision. The court denied reargument sought by Meyers on his claim for punitive damages, explaining that reargument was unnecessary because it had already considered all of the factual and legal issues raised by Meyers in his motion to reargue when it rendered its November 12, 2015 decision. In the absence of specific details set forth by the trial court upon which it may have relied, and thus possibly erred, in declining to award punitive damages, we presume that it properly applied the law and did not abuse the wide discretion afforded to it in making that determination.

C

Finally, Meyers claims that the court erred in rejecting his claim for intentional infliction of emotional distress. Meyers argues that the court erred in failing to find that Cohen's actions constituted extreme and outrageous conduct. We disagree.

"[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . A factual finding may be rejected by this court only if it is clearly erroneous." (Internal quotation marks omitted.) *Murphy* v. *Lord Thompson Manor, Inc.*, 105 Conn. App. 546, 552, 938 A.2d 1269, cert. denied, 286 Conn. 914, 945 A.2d 976 (2008).

"In order for the plaintiff to prevail in a case for liability . . . [alleging intentional infliction of emotional distress], four elements must be established. It must be shown: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe. . . . Liability for intentional infliction of emotional distress requires conduct that exceeds all bounds usually tolerated by decent society . . . . Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him

to exclaim, Outrageous! . . . Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." (Citations omitted; internal quotation marks omitted.) *Appleton* v. *Board of Education*, 254 Conn. 205, 210–11, 757 A.2d 1059 (2000).

In considering Meyers' claim for intentional infliction of emotional distress, the court noted that "[t]he 'conduct' that is identified as the cause of Meyers' emotional distress consists of written and verbal oral communication with various newspaper outlets, state officials, town officials and members of the public concerning Meyers' past history as a builder and contractor, his current licensure as a building official, and his employment as a building official for the town of Middlefield."

The court found that Cohen had engaged in "an intentional campaign—using permissible methods such as FOIA requests or open comments at public meetings— to drive a wedge between Meyers and his employer, the town of Middlefield. It was marked by tactless, abusive, and derogatory discourse, merciless provocation, and relentless scrutiny, all of which put Meyers under severe, unremitting pressure." The court nevertheless found that "even if Cohen was engaged in a personal vendetta intended specifically to humiliate and harass Meyers or make him lose his job, the specific *conduct* of making defamatory remarks at public meetings, sending letters to government officials containing defamatory statements, and maintaining an Internet website with defamatory information, does not rise to the level of 'extreme and outrageous conduct'—as that concept has been defined in the relevant case authority—necessary to impose liability for intentional infliction of emotional distress. The conduct that has been proven at trial is not extreme and outrageous as a matter of law, and therefore the cause of action for the intentional infliction of emotional distress must fail." (Emphasis in original.)

Meyers claims that the trial court "erred by failing to consider Cohen's overall pattern, series, course and/ or accumulation of acts when determining whether Cohen's actions were sufficiently extreme and outrageous as to constitute an intentional infliction of emotional distress . . . ." Meyers' claim is belied by the trial court's thorough and meticulous recitation of Cohen's conduct. Indeed, the court considered Cohen's conduct in its entirety, finding that he had undertaken a campaign that was designed to harm Meyers' personal and professional reputation. The court nevertheless determined that the manner in which Cohen undertook that campaign against Meyers—through written and verbal statements impugning Meyers— was not extreme and outrageous. The court properly focused on the conduct on which Meyers' claim was based,

rather than by the generalized characterizations of this conduct, regardless of the motivation behind that conduct. His argument that the court erred in rejecting his claim for intentional infliction of emotional distress is unavailing.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The court noted that Cohen had expressed his intention to withdraw his rescission claim, but had never formally done so. On the basis of that stated intention, the court rendered judgment in favor of Meyers on that claim. That ruling has not been challenged on appeal.

[2] The trial court also declined to pierce RMMI's corporate veil pursuant to the identity rule. Cohen has not challenged that ruling.

[3] We note that Cohen did not plead that Meyers was a public official, that his statements involved a matter of public concern or public import, or that his speech was constitutionally protected.

[4] "[T]he clear and convincing evidence standard furnishes the applicable standard of proving actual malice to sustain an award of punitive damages to a private figure plaintiff." *Gleason* v. *Smolinski*, supra, 319 Conn. 433 n.32.

[5] The court explained: "For example, Meyers wrote on his website, 'Housebuilder from Hell,' that 'at some point, Bob Meyers contracted venereal disease' and then warned women to 'practice safe sex,' implying that they may find themselves in a relationship with Meyers since . . . 'I know Bob Meyers at one point was trolling the Internet for women . . . .' Evidently, Cohen based this statement upon entries in the medical records of Meyers (obtained during discovery in this case) that showed he had undergone cauterization of genital warts, which, in the opinion of the doctor, were most likely caused by the human papillomavirus (HPV). True, HPV is primarily spread by sexual intercourse. But it also true that the majority of sexually active adults will be infected by HPV at some point in their lives.

"There is a vastly different impression upon the listener upon learning that a person 'had treatment for genital warts' as opposed to 'contracted a venereal disease.' In fact, putting aside the fact that all of this has nothing to do with Meyers' competence as a builder, the court concludes that inflicting the stigma, humiliation and scorn attached to a 'venereal disease' upon Mr. Meyers, as opposed to relating any true state of facts, was exactly what Cohen intended by his statement. [Cohen] has failed to meet his burden of proving by a preponderance of the evidence that the statement [that] Meyers 'contracted a venereal disease' is substantially true, as that concept has been defined in the relevant case authority.

"In a similar fashion, Cohen's repeated accusations that Meyers was a 'thief' were based on his sophism that Meyers 'stole' the $53,500 payment under the contract. Words claimed to be defamatory are given their natural and ordinary meaning and are taken as reasonable persons would understand them. *Ventresca* v. *Kissner*, 105 Conn. 533, 535, 136 A. 90 (1927). A reasonable person would understand the descriptive term, 'thief,' to apply to a person who commits the crime of theft; someone who wrongfully, stealthily—and sometimes violently—takes the property of another. A reasonable person would not ascribe the term, 'thief,' to a contracting party who has retained funds freely and voluntarily paid to it because of a dispute over who has breached the contract. The use of the word, 'thief,' by Cohen is fully intended to bring down more scorn and contempt upon Meyers than would be occasioned by a statement of the literal truth: 'a defendant in a lawsuit where a breach of a contract to build a house is alleged.' Other than the fact that Meyers retained the initial payment under the contract, the plaintiff offered no other evidence of 'thievery' by Meyers. The plaintiff has failed to prove by a preponderance of the evidence the substantial truth of his many public statements that Meyers is a 'thief.'

"Cohen's repeated references to Meyers committing 'criminal acts' or 'criminal violations,' or being an 'admitted criminal' or even that his contracting business was 'an ongoing criminal enterprise' are based on another fallacious argument. Because the New Home Construction Contractors Act provides for the imposition of criminal penalties in certain cases, and because Meyers has admitted he failed to comply with the NHCCA, Cohen stated that he is an 'admitted criminal'; that he has committed a 'criminal act'; and that his business is a 'criminal enterprise.' But the plaintiff offered no evidence that Meyers had ever been charged with a crime by any law enforcement agency, much less been convicted of a crime. An accusation that a person is 'a criminal' has always been a serious matter in our society. It is associated with behavior that is immoral, antisocial, evil, shameful and fundamentally wrong. Labeling Meyers as an 'admitted criminal' would

create an impression in the mind of the listener many times more damaging than a literally true disclosure of the complete facts as to his violation of the NHCCA and the lack of any criminal charges or convictions. The plaintiff has failed to prove by a preponderance of the evidence the substantial truth of his many public statements that Meyers is a 'criminal' or committed 'criminal acts.'

"Finally, the evidence at trial never made quite clear what the factual basis was for Cohen's statement that Meyers 'cheated on his wife.' The court presumes it had its genesis in the fact that Meyers admitted that he had used an online dating service (match.com). The proof amounted to little more than supposition or conjecture and fell far short of a fair preponderance of the evidence, which is properly defined as the better evidence, the evidence having the greater weight, the more convincing force in your mind. . . . *Cross* v. *Huttenlocher*, 185 Conn. 390, 394, 440 A.2d 952 (1981)." (Footnote omitted.)

[6] The court stated: "As one example, Cohen, on more than one occasion, stated that the conduct of Meyers 'caused' or 'led to' the death in 2007 of one of his customers, John Christopher. The statement that John Christopher's widow, Sandra Christopher, believes that the stress of dealing with the litigation with Meyers hastened John Christopher's demise from cancer is, in all respects, true. The statement that 'Meyers lied, cheated and stole from the Christophers and that led to Mr. Christopher's death,' is not. The latter statement declares a direct cause and effect relationship between the conduct of Meyers and the death of Mr. Christopher that is not warranted or justified by any credible, objective facts.

"Cohen had actual knowledge of the true state of facts. He was fully capable of accurately reciting the facts of Mr. and Mrs. Christopher's story. In a November 26, 2012 letter to the selectmen of the town of Middlefield, Cohen mentions the fact that Mr. Christopher died at a 'relatively young' age without ever living in the 'dream house' that Meyers was to build. The letter tracks very closely the established facts regarding the dispute between the Christophers and Meyers, and nowhere in the letter does Cohen suggest that Meyers' conduct 'led to' Mr. Christopher's death. But, in a familiar pattern that would be seen in other contexts, Cohen's subsequent communication about the subject strays farther and farther from the objective facts until, in the end, there is little truth in them at all.

"In an April 10, 2013 letter to Angie Martinez of the Department of Consumer Protection, Cohen stated that the lawsuit between Meyers and the Christophers 'came to a conclusion when Mr. Christopher died fairly suddenly, perhaps in part because of Mr. Meyers' actions.' In vivid language from his website, 'Housebuilder from Hell,' Cohen tells of 'law-breaking, building code violations, losses totaling many hundreds of thousands of dollars, the death of an aggrieved, home buyer, an alleged threat of extreme violence—and one man at the center of it all—contractor and state-licensed building inspector Robert M. 'Bob' Meyers.' In a June 18, 2013 letter to the Commissioner of the Department of Consumer Protection, Cohen stated that 'Meyers has caused not just terrible problems for consumers, but death, mayhem and other horrors.' The manner and context in which these statements were delivered—in a writing (e-mail) as opposed to speech, and on multiple occasions, persuade this court that this was not a negligent misstatement of fact."